**Carlton MITCHELL, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 97–CF–1090.

District of Columbia Court of Appeals.

Submitted Oct. 15, 1999.

Decided March 2, 2000.

Wilma A. Lewis, United States Attorney, with whom John R. Fisher, Elizabeth Trosman, Thomas A. DiBiase, and Anne Y. Park, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, GLICKMAN, and WASHINGTON, Associate Judges.

GLICKMAN, Associate Judge:

In what started as a traffic stop for a minor parking violation, Park Police recovered a pistol, an ammunition clip and marijuana from appellant Carlton Mitchell's car and person. The police also took a series of incriminating statements from Mitchell beginning prior to and continuing after his formal arrest. After an evidentiary hearing, the trial court denied Mitchell's motion to suppress this evidence. Mitchell then entered a conditional plea of guilty,[1] reserving his right to appeal the adverse rulings on his motion. The issues before us are whether the police violated Mitchell's Fourth Amendment rights in the course of his roadside detention, and whether the police violated Mitchell's Fifth Amendment rights by interrogating him without complying with the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We hold that Mitchell's constitutional rights were honored, and that the trial court therefore did not err in denying his motion to suppress evidence. We accordingly affirm Mitchell's criminal convictions.

Walter S. Booth, Bethesda, MD, appointed by the court, was on the brief for appellant.

---

1. Mitchell pled guilty to carrying a pistol without a license in violation of D.C.Code § 22–3204(a) (1996), possession of an unregistered firearm in violation of D.C.Code § 6–2311(a) (1995), unlawful possession of ammunition in violation of D.C.Code § 6–2361(3) (1995), and unlawful possession of marijuana in violation of D.C.Code § 33–541(d) (1998).

2. This summary of the facts is taken from the testimony at the pretrial suppression hearing,

## FACTS [2]

■ At about 10:30 p.m. on February 26, 1996, Officer Vincent Gaudioso of the

at which both the arresting officer and Mitchell testified. We defer to the trial court's findings of fact unless "clearly erroneous." *Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989), we "view the evidence presented at the suppression hearing in the light most favorable to the party prevailing below, and we draw all reasonable inferences in that party's favor." *Womack v. United States,* 673 A.2d 603, 607 (D.C.1996) (citing *Peay v. Unit-*

United States Park Police was on his motorcycle en route to the Jefferson Memorial when he noticed Mitchell's white Buick Skylark parked on Ohio Drive in violation of posted no parking signs. Seeing Mitchell alone in the car, apparently passed out or asleep in the driver's seat, Officer Gaudioso tapped on the window. Mitchell rolled down the window. Officer Gaudioso told him that he was illegally parked and asked to see his driver's license and registration. Mitchell produced his license and, in lieu of his registration, title to the car in his name. Officer Gaudioso asked Mitchell if he was "okay," and Mitchell said he had just gotten off work and was tired.

In the course of this exchange, Officer Gaudioso shined his flashlight in the car and observed a three-quarter full bottle of malt liquor in the center console and a box of Phillies blunt cigars on the front passenger seat. Suspecting that the cigars might be used to smoke marijuana,[3] Officer Gaudioso next asked Mitchell if he had any marijuana in the car. Mitchell said that he did not. Officer Gaudioso then asked Mitchell to step out of the car, because, the officer testified, "he was in violation with the alcoholic beverage and I was going to search the car and make sure there were no other alcohol beverages in the car."[4]

Officer Gaudioso testified that as Mitchell was exiting the car, he asked Mitchell again if he had any marijuana—and this time Mitchell pointed to the center console and said "it's over there." The officer testified that after he received this response, he patted Mitchell down and, not finding a weapon on him, directed Mitchell to step to the back of the car and keep his hands on the trunk. According to Mitchell, the sequence was different. Mitchell testified that when he exited the car Officer Gaudioso frisked him first (finding nothing), and then asked him for the second time whether he had marijuana. Mitchell admitted, however, that in response to this question, he answered "yeah, it's right there" on the console. In addition, Mitchell testified that when he made this self-incriminating statement he did not feel that he was under arrest or going to be arrested.[5]

By this time, a second officer, Officer Padberg, arrived on the scene to back up Officer Gaudioso. According to Officer Gaudioso, "during the course of time I was patting down Mr. Mitchell and walking him to the back of the car, Officer Padberg had reached in and dumped out the alcohol beverage, and also retrieved the ziplock of marijuana." Thus, by Officer Gaudioso's account, Officer Padberg searched the car and found the bag of suspected marijuana *after* Mitchell admitted to having marijua-

---

ed States, 597 A.2d 1318, 1320 (D.C.1991) (en banc)).

3. Officer Gaudioso testified that "it's a common practice in D.C. for a gentleman to unroll the Phillies blunts and use the tobacco leaf to roll up marijuana and smoke." Officer Gaudioso stated that he personally had seen Phillies blunt cigars used with marijuana inside them on thirty to seventy occasions.

4. Notwithstanding Officer Gaudioso's statement that Mitchell was "in violation with the alcoholic beverage," which the trial court understood to be a reference to the prohibition in D.C.Code § 25–128(a) (1996) against possession of an open container of any alcoholic beverage "in any street, alley, park ... or in any vehicle in or upon the same," the officer did not testify that the bottle he saw in Mitchell's car was in fact open. Mitchell testified

without contradiction that the bottle was closed.

5. Mitchell testified as follows:

Q. Let me ask you this, Mr. Mitchell. At this point [*i.e.*, after he had told Officer Gaudioso the location of the marijuana in his car] did you feel free to leave?
A. Yes. Yeah, yeah, yeah. Because he told me he wasn't going to lock me up because he had a dental appointment until he started looking through the car, looking through the car, looking through the car, looking through the car [sic] and he found a clip [with ammunition to a .380 semiautomatic pistol]....
Q. Did he arrest you?
A. Yes. He found the clip and then he said I'm going to lock you up. I didn't want to lock you up because I had a dentist appointment....

na in the car. On this point Mitchell agreed: *after* he told Officer Gaudioso where to find the marijuana, "that's when he searched the car," and "then he got, you know, the weed out."

Officer Gaudioso then searched the front of the car himself. The officer moved aside some cassette tapes in the center console and found a clip to a .380 semiautomatic pistol containing five rounds. Officer Gaudioso returned to the back of the car, put Mitchell in handcuffs and asked him if he had any weapons in the car or on his person. After Mitchell said he did not, Officer Gaudioso testified that he unzipped Mitchell's coat and discovered a .380 semiautomatic pistol inside his waistband.[6] According to Mitchell, Officer Gaudioso became very angry and began yelling at him when he discovered the pistol after having overlooked it in his earlier frisk.[7]

The police transported Mitchell to First District Police headquarters where Officer Gaudioso read him his *Miranda* rights. Mitchell responded that he did not wish to speak with the police and that he was not willing to answer any questions without an attorney present. He filled out a waiver card accordingly. Nonetheless, over the course of an hour or two while Officer Gaudioso finished processing the arrest, Mitchell made several statements in which he acknowledged his possession of the pistol and ammunition clip. Officer Gaudioso recorded these statements in his notes as Mitchell made them.

According to Officer Gaudioso, as Mitchell was being fingerprinted and before he was warned of his *Miranda* rights, he commented, "damn I looked for that clip, I looked for that clip for four days now. Where'd you find it at?" After the rights warning, while he was sitting next to Offi-

cer Gaudioso who was filling out arrest forms, Mitchell volunteered that the pistol was registered to a friend and "I'd be in the house just practicing how to carry [the weapon] for when I get stopped." Mitchell also stated that he had been charged with first degree murder in 1989, had served eight months in prison, and he started carrying the pistol for self defense after being shot in the legs. Finally, Officer Gaudioso testified that Mitchell commented:

> You patted me down but missed it [the gun]. Only checked again because you saw the clip in the car.... I didn't admit to gun because D.C. jump-out [*i.e.*, D.C. Metropolitan Police Department Viper Squad] searched me once before, pat me down and missed the jump [*i.e.*, gun]. I didn't say nothing and got away with it. A tip for you, a lot of guys who carry wear layer of clothes and put the jump right in the middle of waistband under clothes. Police pat across waist and miss it. You should pull shirts up.... Also pull pants away from body and up. The jump will fall down.

Officer Gaudioso testified that, except for the statement about the 1989 murder charge, Mitchell made these statements spontaneously (i.e., not in response to questions). Mitchell, the officer testified, was "a pretty talkative fellow" and "just started spouting out statements." Mitchell was seated at the time on a wooden bench adjacent to a table where Officer Gaudioso was writing up his reports. Mitchell was not handcuffed because Officer Gaudioso felt he posed no threat and was "compliant" and "friendly." Officer Gaudioso testified that he did not ask Mitchell any questions during the paper-

---

6. Mitchell testified that the police did not discover the pistol until the police transport arrived and he volunteered that he had a gun on him.

7. Mitchell testified as follows:
 I'm not sure which one pulled it off of me, but I let them knew [sic] I had it. I let

them know. And then you [*i.e.*, Officer Gaudioso] said I could of killed you and I said, naw, man, I could have killed you. And then that really made them mad, right. You said go on, get on—he started yelling at me a little bit....

work process about the offenses for which he arrested him or the events of the evening. As Mitchell volunteered his statements, Officer Gaudioso "may have nodded an agreement" or said "yes," "I understand," or "uh huh, uh huh," but, he testified, he did not follow up on Mitchell's statements with questions or comments designed to elicit further admissions. Officer Gaudioso did ask Mitchell for routine biographical information. When he discovered from a records check that Mitchell had a prior first degree murder charge, the officer asked Mitchell "what's the story with the murder case?" This inquiry, which occurred after Mitchell had declined to waive his *Miranda* rights, elicited Mitchell's statement that he had served eight months in prison.

Although he denied using some of the words and phrases that Officer Gaudioso attributed to him, Mitchell did not materially dispute the officer's testimony regarding his station house admissions. He acknowledged that Officer Gaudioso asked him only "biographical questions" and never asked him why he had the pistol or anything else regarding the events that led to his arrest. He explained that he told Officer Gaudioso that the pistol was registered to a friend because he had been allowed to telephone his girlfriend, and she urged him to ask the police if she could retrieve the gun because it belonged to her father. Mitchell stated that it then was "quiet for a little bit," and at some time thereafter he began to reproach Officer Gaudioso for getting so angry with him earlier over belatedly discovering the pistol. According to Mitchell, Officer Gaudioso essentially accepted this reproach with good grace, saying "thank you, man, you right, you could have killed me. I over searched you [*i.e.*, he missed the weapon in his initial frisk]." Mitchell testified that in response he proceeded to give him "a

pointer, you know, to search people more thoroughly."

Mitchell testified that he was not aware that Officer Gaudioso was taking notes while he was speaking and that he had the "impression" that his comments were "off the record." Initially Mitchell indicated that this was only his "impression" and not an explicit commitment by Officer Gaudioso. However, when pressed on the subject by counsel for the government, Mitchell stated that at some point Officer Gaudioso did use the words "off the record" in talking with him. The circumstances and context in which Officer Gaudioso may have said those words to Mitchell were not clarified or further explored in the suppression hearing. Officer Gaudioso was not asked if he told Mitchell that anything would be off the record, and the trial court made no findings as to whether such a statement was made.

The trial court denied Mitchell's motion to suppress the marijuana, pistol and pistol clip seized at the time of his arrest. The court reasoned that in the course of investigating a parking violation, Officer Gaudioso observed what he surmised was an open container of alcohol in the vehicle, which supported a search of the car. In addition, the court reasoned that based on his observation of the Phillies blunts, the officer was entitled to ask Mitchell more than once whether there was marijuana in the car; and Mitchell's affirmative response furnished probable cause to arrest him and search both him and the car. The court also denied the motion to suppress Mitchell's incriminating statements at the scene of his arrest and in the police station, finding specifically that Mitchell offered the statements he made at the station voluntarily and without being asked any questions.[8] However, the court did

---

8. In reaching this conclusion, the trial court took into account Mitchell's demeanor when he testified, observing that "having seen Mr. Mitchell on the witness stand, he's—he's kind of a talkative person and I can well imagine a

scenario in which during the course of the paperwork being done and the processing that he would at various points say all the things, and indeed, he admits saying most of

suppress Mitchell's statement regarding his 1989 murder case on the ground that Officer Gaudioso asked about the murder charge after Mitchell had invoked his right to remain silent.[9]

Mitchell thereupon entered a conditional guilty plea to the charges of carrying a pistol without a license, possession of an unregistered firearm, possession of ammunition, and possession of marijuana, reserving his right to appeal the denial of his motions to suppress evidence.

## DISCUSSION [10]

On appeal, Mitchell argues that the trial court should have suppressed the physical evidence seized from his car and person because the police lacked articulable suspicion to order him out of his car for a frisk on a non-moving parking violation and lacked probable cause to search his car. He argues that the trial court should have suppressed his statement that he had marijuana in his car because it was the product of on-scene custodial interrogation not preceded by *Miranda* warnings. Finally, he argues that the trial court should have suppressed his statements at the police station because he invoked and

never waived his right under *Miranda* not to be questioned without an attorney present.[11]

Like the trial court, we are satisfied that Mitchell was restrained and "seized" within the meaning of the Fourth Amendment after Officer Gaudioso approached him in his parked vehicle, asked him to produce his license and registration, and then ordered him out of the car. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendment[ ], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). That Mitchell was already "stopped," *i.e.*, parked, when the officer came up to him does not alter the nature of the encounter in this case. *See Jones v. United States*, 391 A.2d 1188, 1190 (D.C. 1978) (ordering occupant of parked car to exit constitutes a Fourth Amendment "seizure"). Notwithstanding Mitchell's testimony when asked if he felt free to leave, see *supra* note 5, we accept that a reasonable person in his position would not have felt free to leave or to disregard the offi-

---

them that Officer Gaudioso wrote down without any questions being asked to him at all."

9. For the sake of clarity, we note that Mitchell did not contend that any other statements, such as his statement that he started carrying a pistol for self defense after having been shot, were also part of his response to the officer's inquiry about the 1989 murder charge. The record is, at best, suggestive but ultimately unclear on this point, and the trial court made no finding one way or the other. Moreover, Mitchell does not argue on appeal that any other statements he made were in response to the question about his murder case, and the government does not address this possibility either. Under these circumstances, we deem any such argument to be waived.

10. In contrast to our deferential review as to the facts, see *supra* note 2, our review of the legal issues presented by those facts is *de novo*. *See, e.g., Womack v. United States*, 673 A.2d at 607; *Gilmore v. United States*, 742

A.2d 862 (D.C.1999); *see also Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

11. Mitchell has also sought to challenge on appeal the trial court's denial of a motion he had made for leave to file an untimely motion to dismiss the indictment on the ground that D.C.Code § 22–3204 (carrying a pistol without a license) is unconstitutional under the Second Amendment. However, Mitchell failed to reserve in writing the right to seek review of this trial court ruling when he entered his conditional plea of guilty, as required by Super. Ct.Crim. R. 11(a)(2). His right to challenge the trial court's denial of leave to file his motion to dismiss the indictment has therefore been waived. *See Demus v. United States*, 710 A.2d 858, 859 (D.C. 1998); *Collins v. United States*, 664 A.2d 1241, 1242 (D.C.1995). We note that this court has previously ruled, contrary to Mitchell's position, that § 22–3204 does not violate the Second Amendment. *See Sandidge v. United States*, 520 A.2d 1057 (D.C.1987).

cer's commands. *See, e.g., Florida v. Bostick*, 501 U.S. 429, 440–41, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

 Inasmuch as it is undisputed that Officer Gaudioso observed that Mitchell was parked in a no parking zone in violation of 18 DCMR § 2400.6 (1995), the officer's actions in stopping at the vehicle and detaining Mitchell in order to investigate were constitutionally permissible. *See Whren v. United States*, 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Minnick v. United States*, 607 A.2d 519, 524 (D.C.1992). It is immaterial for Fourth Amendment purposes that the infraction in question was not a moving violation. *See Mayes v. United States*, 653 A.2d 856, 861–62 (D.C.1995); *Banks v. United States*, 287 A.2d 85, 86 (D.C.1972). Further, as Officer Gaudioso was lawfully positioned to see inside Mitchell's car, his use of a flashlight to illuminate the interior, which enabled him to observe a bottle of malt liquor and a box of blunt cigars, did not constitute a "search" within the meaning of the Fourth Amendment. *See Payne v. United States*, 292 A.2d 800, 803–04 (D.C.1972); *see generally* 1 LaFave, Search and Seizure § 2.2(b) (3rd ed.1996).

 The parking violation did not in itself justify the search of Mitchell's car, given that Officer Gaudioso was not purporting to arrest Mitchell for that infraction. *See Knowles v. Iowa*, 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (warrantless search of automobile incident to citation for traffic violation issued in lieu of arrest violates Fourth Amendment); *cf. Taylor v. United States*, 662 A.2d 1368, 1370–71 (D.C.1995) (upholding search of defendant's car following arrest for driving without a license). Nor are we satisfied, on the record before us, that what Officer Gaudioso saw inside the car furnished probable cause sufficient either to arrest Mitchell and search his car incident to that arrest, *see New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *United States v. Harris*, 617 A.2d 189, 193 (D.C.1992); or to search his car for contraband, *see Pennsylvania v. Labron*, 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996); *Speight v. United States*, 671 A.2d 442, 453 (D.C.1996). We accept that blunt cigars may, as Officer Gaudioso testified, be used for smoking marijuana. However, that possibility without more did not render such legal and widely sold items sufficiently incriminating to establish probable cause. An *open* container of alcohol in the car would have constituted contraband under D.C.Code § 25–128(a) (1996).[12] Officer Gaudioso never testified, however, that the bottle in Mitchell's car was open (and Mitchell testified that it was not). See *supra* note 4. Mere possession in a car of a *closed* bottle containing an alcoholic beverage does not, without more, furnish probable cause even where, as here, the bottle is only three-quarters full (indicating that it had been open at some prior time). Even taken in conjunction with the facts that Mitchell was illegally parked late at night, that he was apparently asleep and that he said he was tired, and that the bottle was partially empty (indicating that it had been open at some prior time), Officer Gaudioso's observations did not, in our view, add up to probable cause for anything other than the parking violation.

 On the other hand, the lawful traffic stop had not come to an end when Officer Gaudioso ordered Mitchell out of his car. Officer Gaudioso had not yet done a computer check on Mitchell or his car and had not yet concluded the stop by making an arrest or issuing a citation or mere reprimand. Because a legitimate traffic stop was not yet over, it was constitutionally permissible for Officer Gaudioso to ask Mitchell to exit his car. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6,

---

**12.** The 1999 Supplement to D.C.Code § 25–128(a) prohibits "opened" containers of alcohol in non-storage areas of vehicles. However, the version of the statute in effect at the time of Mitchell's arrest criminalized "open" containers. *See* D.C.Code § 25–128(a) (1996).

98 S.Ct. 330, 54 L.Ed.2d 331 (1977). This is so notwithstanding the fact that Officer Gaudioso's subjective intent was to conduct a search for which we hold he lacked constitutional justification at that time. The lawfulness of a detention under the Fourth Amendment depends on its objective reasonableness, irrespective of the police officer's subjective motivation. *See Ohio v. Robinette,* 519 U.S. 33, 38, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Whren,* 517 U.S. at 813, 116 S.Ct. 1769.

 Mitchell was thus still legitimately detained pursuant to a routine traffic stop when Officer Gaudioso asked him (for the second time) if he had marijuana in his possession. This is true whether or not Officer Gaudioso frisked Mitchell before or after he asked that question.[13] Nonetheless, Officer Gaudioso's inquiries about marijuana were unrelated to the parking violation that triggered the traffic stop, and we must therefore consider whether those inquiries were outside the legitimate scope of the stop.

The Supreme Court has said that the "usual traffic stop is more analogous to a so-called '*Terry* stop,'... than to a formal arrest," *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), and that in such a case the "stop *and inquiry* must be 'reasonably related in scope to the justification for their initiation.'" *Id.* (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) and *Terry,* 392 U.S. at 29, 88 S.Ct. 1868 (emphasis added)).

> Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not

obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.

*Berkemer,* 468 U.S. at 439–40, 104 S.Ct. 3138 (footnotes omitted). In a footnote the Supreme Court qualified its analogy of the typical traffic stop to a *Terry* stop with the statement that "[w]e of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop." *Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138. Courts have not read this cautionary statement, however, to imply that the existence of probable cause to believe that only a minor traffic violation was committed is sufficient to sanction a substantially more intrusive stop than would be justified under. *Terry,* at least where the police officer is not undertaking to make an arrest based on the traffic violation. *Cf. Knowles,* 525 U.S. at 113, 119 S.Ct. 484.

One federal circuit court has interpreted the requirements of the Fourth Amendment in this area as follows:

> An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.... When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.... In order to justify 'a temporary detention for questioning [14],' the officer must also have reasonable suspicion 'of illegal transactions in drugs or of any other serious crime.'

*United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988) (citations omitted)

---

**13.** It does not appear from the record that Officer Gaudioso's initial patdown of Mitchell was justified, as it should have been, by specific articulable facts giving rise to a reasonable suspicion that Mitchell was armed. *See Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). But this is not an

issue that need detain us, since the initial patdown did not result in the discovery of a weapon or any other evidence.

**14.** *I.e.,* questioning unrelated in subject matter to the reasons for the traffic stop.

(quoting *Florida v. Royer*, 460 U.S. 491, 498–99, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)). In *Guzman*[15] the court of appeals held that where "[n]o objective circumstances suggested that [the defendants] had committed any crime more serious than failure to wear their seatbelts," *id.*, a police officer had exceeded the legitimate scope of a traffic stop by asking a series of questions which were unrelated to the seatbelt violation and which prolonged the stop and led ultimately to the discovery of cocaine in the vehicle. *See also United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995); *United States v. Fernandez*, 18 F.3d 874, 880–81 (10th Cir.1994); *United States v. Walker*, 933 F.2d 812, 815–17 (10th Cir.1991).[16]

In *United States v. Shabazz*, 993 F.2d 431 (5th Cir.1993), the Fifth Circuit agreed with the Tenth that extensive questioning on a subject unrelated to the purpose of the traffic stop may result in a Fourth Amendment violation if the questioning unduly prolongs the stop. The Fifth Circuit demurred, however, from certain of the implications of *Guzman* and its Tenth Circuit progeny, inasmuch as it "reject[ed] any notion that a police officer's questioning, even on a subject unrelated to the purpose of the [traffic] stop, is itself a Fourth Amendment violation." *Shabazz*, 993 F.2d at 436. In that case, police officers stopped a vehicle for speeding and, while they were awaiting the results of a computer check on the license of the driver, proceeded to ask the driver and the passenger in the vehicle a series of questions concerning their recent whereabouts. In asking these questions the police officers had no reason to suspect any offense other than the speeding violation. However, their inquiries generated conflicting stories from the driver and the passenger and led ultimately to the officers' discovery of cocaine in the vehicle. The Fifth Circuit reasoned that "[m]ere questioning ... is neither a search nor a seizure," and that "detention, not questioning, is the evil at which *Terry's* second prong[17] is aimed." *Id.; see also Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Since, in the case before it, "the questioning did nothing to extend the duration of the initial, valid seizure," *Shabazz*, 993 F.2d at 437, the Fifth Circuit concluded that the interrogation was constitutionally permissible and upheld the resulting search and seizure of the drugs.

■ There is some tension between the holding of *Shabazz* and the Supreme Court's admonition, quoted above, that the police *inquiry*, as well as the stop itself, must be reasonably related in scope to the justification for the Fourth Amendment intrusion. *Cf. United States v. Sharpe*, 470 U.S. 675, 683–86, 105 S.Ct. 1568, 84

---

**15.** The Tenth Circuit overruled *Guzman* on unrelated grounds in *United States v. Botero–Ospina*, 71 F.3d 783, 786–87 (10th Cir.1995) (en banc). The *Botero–Ospina* court, however, specifically affirmed the portions of *Guzman* relevant to our analysis.

**16.** See also Chief Judge Arnold's opinion in *United States v. Ramos*, 42 F.3d 1160 (8th Cir.1994), where the officer made an initially permissible traffic stop after observing a passenger not wearing his seat belt:

 After stopping the truck, the trooper could ask any questions reasonably related to the stop .... Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose ....

 If reasonably related questions raise inconsistent answers, or if the licenses and registration do not check out, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions. If, however, no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop.

*Id.* at 1163 (citations omitted); *accord United States v. Hernandez*, 872 F.Supp. 1288, 1293–96 (D.Del.1994).

**17.** "The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19, 88 S.Ct. 1868 (citation omitted).

L.Ed.2d 605 (1985) (in evaluating whether a *Terry* stop has been unduly prolonged, the issue is the reasonableness of the detention in light of the circumstances, *not* the duration *per se* ). While the Supreme Court has stated that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions," it made that statement in the context of a consensual encounter in which a reasonable person "would feel free 'to disregard the police and go about his business.' " *Florida v. Bostick,* 501 U.S. at 434, 111 S.Ct. 2382 (quoting *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). But if the encounter loses its consensual nature, then Fourth Amendment inquiry is triggered. *Id.* Thus, the Court stated, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual ... *as long as* the police do not convey a message that compliance with their requests is required." *Id.* at 434–35, 111 S.Ct. 2382 (emphasis added). Where, as in this case, a suspect is ordered out of his car in the course of a traffic stop, the encounter is not consensual, and the message that compliance with police requests is required is implicit. *See Berkemer,* 468 U.S. at 436–38, 104 S.Ct. 3138.[18]

▉ Without wholly endorsing the Fifth Circuit's analysis in *Shabazz,* however, we think that Officer Gaudioso's limited inquiries of Mitchell were justified under the facts of this case. The Supreme Court has emphasized that the ultimate "touchstone" of Fourth Amendment analysis is "reasonableness," as "measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette,* 519 U.S. at 39, 117 S.Ct. 417 (citation omitted). To begin with, it cannot be said that the

stop of Mitchell was prolonged in any meaningful sense merely because Officer Gaudioso asked an isolated question or two about marijuana possession. More important, in our view, where an officer conducting a routine traffic stop perceives articulable facts that give rise to a reasonable suspicion of additional criminal activity, the officer may continue to detain the driver and expand the scope of investigation commensurately. *See Jones,* 44 F.3d at 872 (citations omitted) ("[s]ubsequent or concurrent detentions for questioning are justified only when the officer has 'reasonable suspicion' of illegal transactions in drugs or of any other serious crime"); *see also United States v. Finke,* 85 F.3d 1275, 1280 (7th Cir.1996). Unlike the police officers in *Shabazz,* Officer Gaudioso did have a reasonable basis for his specifically focused inquiry about a matter (in this case, possible possession of marijuana) that was unrelated to the traffic violation which initially justified the traffic stop. For in the course of his stop, Officer Gaudioso observed Mitchell apparently unconscious and parked illegally in an isolated location late at night. The officer then saw that next to Mitchell, in plain view on the center console, was a three-quarter full bottle of malt liquor. On the front passenger seat, Officer Gaudioso observed a box of Phillies blunt cigars which, the officer knew from ample prior experience, were commonly used to smoke marijuana. We think the combination of these articulable facts supported a reasonable suspicion on the part of an experienced police officer that Mitchell might have marijuana in his possession and, further, that he might be under the influence of alcohol or marijuana while sitting in the driver's seat of his vehicle. *See Ford v. United States,* 376 A.2d 439, 442 (D.C.1977) ("within the con-

18. The Supreme Court has acknowledged that in a traffic stop, "the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions." *Berkemer,* 468 U.S. at 438, 104 S.Ct. 3138. However, this observation does not compel the conclusion that police questioning during a traffic stop constitutes custodial interrogation necessitating the giving of *Miranda* warnings. *See id.*

**890**

text of a valid traffic stop" police officers may ask investigative questions based on reasonably aroused suspicion). We are therefore satisfied that Officer Gaudioso's questions about marijuana possession were justified.

■■■ While Officer Gaudioso did not advise Mitchell of his *Miranda* rights before asking him if he had marijuana, he was not required to do so. The Supreme Court has held that for Fifth Amendment purposes, ordinary traffic stops are like *Terry* stops—though "significantly curtail[ing] the 'freedom of action' of the driver," they do not constitute "custody" requiring *Miranda* warnings prior to moderate questioning of the detainee. *Berkemer,* 468 U.S. at 436–37, 439–440, 104 S.Ct. 3138. In order to constitute "custody" for *Miranda* purposes, the suspect must be subject to "the functional equivalent of formal arrest." *Id.* at 442, 86 S.Ct. 1602; *see also Morris v. United States,* 728 A.2d 1210, 1216 (D.C.1999). Under either Officer Gaudioso's or Mitchell's recounting of events, Mitchell was not yet in custody when Officer Gaudioso questioned him and he admitted to possessing marijuana in his car.

■■■ Mitchell's admission that he had marijuana in his car unquestionably established probable cause to search the vehicle and any containers found therein that might contain the contraband, *see California v. Acevedo,* 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); to arrest Mitchell for possession of the marijuana and ammunition clip found in the search, and then to search him incident to his arrest, *see United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467; 38 L.Ed.2d 427 (1973).

We thus conclude that neither Mitchell's roadside admission nor the physical evidence seized from his car and his person were obtained in violation of his constitutional rights. The trial court correctly denied Mitchell's motion to suppress that evidence.

We reach the same conclusion regarding Mitchell's motion to suppress the incriminating statements he made at the police station either before he received his *Miranda* warnings or after he received them and invoked his right to refuse to answer questions. We affirm the trial court's finding that Mitchell's statements were spontaneously volunteered and not the product of police interrogation.

■■■ Mitchell was under arrest and in custody during the booking process at the police station. Before interrogating Mitchell, the police were therefore obligated to advise him of his Fifth Amendment rights and to obtain his knowing and intelligent waiver of those rights. *See Miranda,* 384 U.S. at 444, 471, 473–76, 86 S.Ct. 1602. Statements obtained by custodial interrogation that precedes a valid waiver of *Miranda* rights are suppressible. *Id.* And once a suspect invokes his *Miranda* right to curtail questioning without counsel, the police must "scrupulously honor" that request in order for post arrest statements to be admissible. *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The police must stop interrogation "until counsel has been made available to [the suspect], unless the accused himself initiates further communications, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 485–86, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If the suspect does initiate communications with the police after having refused to answer questions, the police may not then resume interrogation without counsel present unless the suspect's purported waiver of the right to counsel is knowing, intelligent and voluntary. *See id.* at 486 n. 9, 101 S.Ct. 1880; *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

■■■ On the other hand, if a suspect in custody makes voluntary statements without being interrogated, the govern-

ment may use such statements without violating the suspect's *Miranda* rights.

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478, 86 S.Ct. 1602, *quoted in Rhode Island v. Innis*, 446 U.S. 291, 299–300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

▇▇▇▇ The admissibility of Mitchell's statements at the police station thus turns on whether he made them in response to police interrogation, or—as the trial court found—voluntarily and without being interrogated. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682 (footnote omitted). *See also United States v. Alexander*, 428 A.2d 42, 51 (D.C.1981); *Wilson v. United States*, 444 A.2d 25, 28–29 (D.C. 1982). The test for whether police remarks are the functional equivalent of express questioning is an objective one, which "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682.

▇▇▇▇ In applying this test, courts must be alert to the subtle forms that interrogation may assume, while appreciating that not every comment by a police officer is "reasonably likely to elicit an incriminating response." *Id.* at 303, 100 S.Ct. 1682 (distinguishing "evocative" statements or "lengthy harangue in the presence of the suspect" from "a few offhand remarks"). Routine questions related to the booking process, for example, are not normally considered "interrogation" under *Miranda*, for such questions are not normally likely to elicit incriminating answers. *See id.; see also Pennsylvania v. Muniz*, 496 U.S. 582, 601, 604–05, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (plurality opinion); *Thomas v. United States*, 731 A.2d 415, 420–26 (D.C.1999). But as *Thomas* illustrates, when "booking" questions are reasonably calculated to evoke incriminating replies, the requirements of *Miranda* and *Edwards* must be satisfied. Similarly, it is not usually "interrogation" when a police officer *merely* informs a suspect why he is being arrested, though this too can be transformed into "interrogation" depending on how it is done and the context in which it is done. *See United States v. Brown*, 737 A.2d 1016, 1019–21 (D.C.1999).

▇▇▇▇ We agree with the trial court that Mitchell failed to establish that he made his inculpatory admissions in response to being interrogated at the police station by Officer Gaudioso. There is ample support in the testimony of both the officer and Mitchell himself, recounted earlier in this opinion, that Mitchell's statements were spontaneous and voluntary, *i.e.*, not the product of either express questioning or its functional equivalent. It is true that Mitchell testified that he told Officer Gaudioso that the pistol was registered to a friend because Mitchell was prodded to do so by his girlfriend, whom he was permitted to telephone while in custody. Absent any evidence that the police engineered or manipulated the telephone call in order to produce an incriminating statement, however, Mitchell's voluntary statements to Officer Gaudioso after he made the call cannot be attributed to police interrogation. *See Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

▇▇▇▇ Setting aside his question about

Mitchell's 1989 murder charge,[19] the biographical questions that Officer Gaudioso concededly asked Mitchell were not of the sort likely to elicit incriminating responses. Mitchell's testimony that at some point Officer Gaudioso said to him that something was "off the record" does give us pause, for we can well imagine that such an assurance might be a ploy to encourage a suspect in police custody to make inculpatory admissions, thereby constituting a component of interrogation forbidden under *Miranda*. But Mitchell failed to substantiate this possibility. Nothing in the record establishes either when or in what context Officer Gaudioso allegedly made the remark, or what if any statements by Mitchell it allegedly evoked.

We are likewise sensitive to the fact that by his own admission, Officer Gaudioso responded to Mitchell's volunteered statements, since we appreciate that a back and forth exchange between officer and arrestee can turn into the functional equivalent of interrogation. Officer Gaudioso's nods and his comments along the lines of "yes," "I understand," and "uh huh," did nothing to discourage Mitchell from continuing to make incriminating admissions. But this, without more, does not suffice to show that Officer Gaudioso interrogated Mitchell by means of those reactions. *See Gilmore*, 742 A.2d at 869–70. Nothing in the record suggests that the officer's nods and remarks were other than neutral and passive; they cannot be characterized as coercive or inquisitorial. *See Wilson*, 444 A.2d at 28–30 (finding that officers who intended to induce the suspect into waiving *Miranda* rights by engaging the suspect in conversation did not "scrupulously honor" the suspect's right not to be interrogated; the conversation under these circumstances was "reasonably likely to elicit an incriminating response"). There is likewise no evidence that Mitchell perceived or would have been likely to perceive Officer Gaudioso's reactions as the equivalent of questioning. The officer's receptive gestures and comments, "although striking a responsive chord, ... did not rise above the subtle compulsion inherent in arrest which the *Innis* Court refused to equate with interrogation." *Brown*, 737 A.2d at 1020 (citations and internal quotation marks omitted). We take a similar view of what Mitchell testified was Officer Gaudioso's surprisingly apologetic reaction when Mitchell reproached the officer for berating him after discovering the pistol. The officer's remarks were not interrogative or coercive in form or spirit, nor in our view could Mitchell reasonably have felt them to be such.

We conclude that Mitchell's incriminating admissions were volunteered and were not the product of either express questioning or its functional equivalent. As we uphold the trial court's rulings denying Mitchell's motions to suppress evidence, we affirm his convictions.

*So ordered.*

---

19. Since the government has not challenged the trial court's ruling on this question, we do not decide whether it was impermissible interrogation under *Miranda* and *Innis*. See also *supra* note 9.