UNITED STATES of America,

v.

Everett THOMAS, Defendant.

No. 96–CR–0173A.

United States District Court,
W.D. New York.

April 7, 1997.

Patrick H. Nemoyer, United States Attorney, for Government; George C. Burgasser, Assistant United States Attorney, Buffalo, NY, of Counsel.

William Clauss, Federal Public Defender, for Defendant; Marianne Mariano, Assistant Federal Public Defendant, Buffalo, NY, of Counsel.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on February 5, 1997. On December 18, 1996, defendant filed a motion to suppress statements. On March 7, 1 997, Magistrate Judge Foschio filed a Report and Recommendation recommending that defendant's motion to suppress be denied.

This Court, having carefully reviewed Magistrate Judge Foschio's Report and Recommendation, and submissions of the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, defendant's motion to suppress is denied.

IT IS FURTHER ORDERED that the parties shall appear in Part II of this Court

at 9:00 a.m. on April 8, 1997 for a meeting to set trial date.

IT IS SO ORDERED.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned by the Hon. Richard J. Arcara on February 5, 1997 for disposition of all pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and for report and recommendation pursuant to § 636(b)(1)(B). It is presently before the court on the Defendant's motion to suppress statements. All non-dispositive motions were resolved on the record on January 30, 1997.

### BACKGROUND

The Defendant was charged, in an indictment dated November 14, 1996, with two counts of violating 18 U.S.C. § 111. Specifically, he was charged with the forcible assault of and interference with two officers of the Department of Veteran Affairs. On August 26, 1996, while employed at the Veteran's Administration Medical Center, the Defendant allegedly assaulted two hospital security guards.

The instant motion was filed on December 18, 1996, seeking the suppression of statements made by him while he was in custody and prior to the administration of *Miranda* warnings. The Government filed its response on January 6, 1997. An evidentiary hearing was conducted before this court on February 6, 1997. Oral argument was heard at that time. For the reasons that follow, the motion to suppress should be DENIED.

### FACTS

The Government called one witness, Jeffrey M. Peterkin, the Assistant Chief of Police Security Service at the Veteran's Administration Medical Center in Buffalo, New York. (T.4).[1] While on duty on August 26, 1996, Peterkin received a radio call from a patrolman to report to the mail room. (T.5). When he arrived, he saw defendant Thomas,

a mail room employee, face down on the floor with his hands cuffed behind his back. (T.6). Another officer, Patrolman McDonald, was leaning against a wall looking dazed and acting confused. (T.6). Patrolman Heinz explained that the officers had fought with Thomas regarding Thomas' alleged refusal to show his identification to enter the mail room. (T.6). Peterkin and Heinz then helped Thomas to his feet to escort him to the police office. (T.7, 23). While walking down the hallway, with Patrolman McDonald following behind, Peterkin heard Thomas mumbling to himself that "this is bullshit, I don't have to show them anything." (T.8). Peterkin then asked Thomas, "Well, why didn't you just show him your ID?" (T.8). Thomas said "it goes back to the clothing room ... this has been brewing for a long time," and then stated that, if the "big officer" (Heinz) had not been present, "he would have killed him (McDonald)." (T.8–9). Peterkin then said "forget it, just be quiet," and they proceeded to the office. (T.9).

Assistant Chief Peterkin testified that he did not intend to elicit an incriminating statement, but was merely engaging in casual conversation. (T. 16). Thomas was in custody, not free to leave and was going to be charged with a crime. (T. 12, 24). Later, in the police office, Thomas was advised of his *Miranda* rights. (T.39).

### DISCUSSION

It is well settled that statements made during custodial interrogation are generally inadmissible unless a suspect has first been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). As the Government has conceded that Thomas was in custody at the time that he made the challenged statements, the only question before the court is whether Thomas was subject to interrogation.

Interrogation is "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The functional equivalent of interrogation is "any words or

---

1. "T." references are to the transcript of proceedings of February 6, 1997.

actions ... that the police should know are reasonably likely to elicit an incriminating response," *Innis, supra,* at 301, 100 S.Ct. at 1689, and "to produce psychological pressures that will subject the individual to the 'will' of his examiner." *United States v. Morales,* 834 F.2d 35, 38 (2d Cir.1987) (citations omitted). While this definition focuses on the perceptions of the suspect, rather than the intent of the police, interrogation also "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis, supra,* at 301, 100 S.Ct. at 1689; *United States v. Moody,* 649 F.2d 124, 127–28 (2d Cir.1981).

> Custodial interrogation exists when a law enforcement officer questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, ... and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures sought.

*Morales, supra* (citations omitted). In making an assessment of interrogation, the court must consider the totality of the circumstances of the police conduct. *United States v. Cota,* 953 F.2d 753, 758 (2d Cir.1992). Routine questions, innocent of any investigative purpose, do not pose the dangers *Miranda* was designed to check. *United States v. Carmona,* 873 F.2d 569, 573 (2d Cir.1989).

Thomas argues that, as Peterkin's inquiry was prefaced by the word "why," a commonly understood word denoting a question, and was directed to the cause of the incident in the mail room, the question was necessarily intended to elicit a response and was therefore either expressly interrogation or its functional equivalent. The Government contends that Peterkin's statement was not intended to elicit an incriminatory response and, moreover, Thomas' statements were spontaneous, voluntary and non-responsive to the question.

In *United States v. Morales, supra,* the court found that no custodial interrogation had occurred where a physician's assistant questioned an inmate about a bag that had fallen to the floor following a physical examination. The court found no investigatory purpose in the questions, as the physician's assistant was not trained to conduct interrogation and the inquiry was "largely the product of curiosity." *Morales, supra,* at 38.

■ In the instant case, while being escorted to the police office, Thomas muttered to himself about showing his ID, and Peterkin asked him why he simply did not show it. Although the facts in this case are somewhat distinguishable from those of *Morales* in that, unlike the assistant in *Morales,* Peterkin was a trained investigator and well versed in the techniques of interrogation and constitutional requirements, the record amply supports a finding that Peterkin's question was neither investigatory nor calculated to induce "a measure of compulsion above and beyond that inherent in custody itself." *Innis, supra,* at 301, 100 S.Ct. at 1689. Here, the parties were walking in a hallway to an office where formal charges were to be prepared, and, significantly, the conversation was initiated when Thomas began to "mutter" about the incident. Peterkin's inquiry, a response to Thomas' "muttering," can thus be viewed as more "the product of curiosity" than the result of a purposeful interrogation. *Morales, supra,* at 38. The interaction between Peterkin and Thomas was indisputedly brief, and after Peterkin realized that Thomas' further statement, discussed below, was potentially provocative, he directed Thomas to keep quiet. In these circumstances, it cannot be said that Peterkin's question was a form of compulsion. Thomas' response therefore is not the product of custodial interrogation or its functional equivalent, and should be admissible.

■ Even if Peterkin's question were held to be a form of custodial interrogation, there is no basis upon which to suppress all of Thomas' statements. In response to Peterkin's inquiry, Thomas first stated that the incident had been "brewing" for a long time and was related to another incident in the "clothing room." Under the foregoing analysis, this statement should not be suppressed. Shortly thereafter, however, Thomas made the further statement that he would have killed Patrolman McDonald had Patrolman

Heinz not been present. This second statement was not responsive to Peterkin's question regarding Thomas' failure to provide the disputed identification, but was an unsolicited, spontaneous and voluntary statement that falls outside *Miranda's* requirements. Thomas' response that he had had a prior problem with McDonald arising from some earlier incident was the immediate answer to Peterkin's question. Thomas' further comment as to what he would have done to McDonald was a voluntary spontaneous utterance unprompted by Peterkin's initial query. Assuming, *arguendo,* Peterkin's question reflected an investigative purpose and created some measure of coercive effect, the court cannot agree that the question was reasonably likely to elicit Thomas' subsequent incriminating response. *Innis, supra,* at 301, 100 S.Ct. at 1689. Peterkin's single inquiry about the genesis of the altercation was. under all the circumstances, not calculated to induce an admission as to Thomas' intent. *See United States v. Castro,* 723 F.2d 1527, 1530 (11th Cir.1984) ("We got money" held "totally unresponsive" to agent's question "What in the world is going on here?"). Thomas' statement expressing an intent to kill McDonald should therefore be admissible even if Peterkin's question is found to be custodial interrogation.

### CONCLUSION

Based on the foregoing, the motion to suppress should be DENIED.