Elton R. JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CM–1220.

District of Columbia Court of Appeals.

Argued May 22, 2001.
Decided Aug. 16, 2001.

Corinne Beckwith, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

John R. Fisher, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and Susan A. Nellor and Jeffrey W. Bellin, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, TERRY, STEADMAN, SCHWELB, FARRELL, RUIZ, REID, GLICKMAN, and WASHINGTON, Associate Judges, and MACK, Senior Judge.

## ON REHEARING EN BANC

SCHWELB, Associate Judge:

Following a bench trial, Elton R. Jones was convicted of one count of unlawful possession of cocaine, in violation of D.C.Code § 33–541(d) (1998). Jones filed a timely notice of appeal, contending that the trial judge had committed reversible error by denying Jones' motion to suppress, on *Miranda* grounds,[1] an incriminating statement that Jones had made to the police at the scene of the offense.

On March 4, 1999, a division of this court reversed Jones' conviction. *Jones v. United States,* 726 A.2d 186 (D.C.1999) (*Jones I*). The court held that Jones was in police custody at the relevant time, that the words and actions of the police which led to Jones' incriminating statement were the "functional equivalent of questioning," and that Jones' statement was therefore the product of "custodial interrogation" as that term was used in *Miranda* and in *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *Jones I, supra,* 726 A.2d at 188–90. Because Jones had not been advised of his rights in conformity with *Miranda,* the division held that his statement should have been suppressed; accordingly, the division reversed Jones' conviction. *Id.* at 190.

The United States filed a petition for rehearing or rehearing en banc, contending that Jones was not in custody at the time that he made the incriminating statement and that, even if he was, the statement sought to be suppressed was not made in response to police interrogation. On March 2, 2000, the division issued a revised opinion on rehearing in which it elaborated on its prior analysis but adhered to its disposition in *Jones I. Jones v. United States,* 747 A.2d 558 (D.C.2000)

(*Jones II*). One judge dissented. *Id.* at 563–64.

On February 13, 2001, we granted the government's petition for rehearing en banc addressed to the decision in *Jones II. Jones v. United States,* 770 A.2d 66 (D.C. 2001) (en banc) (per curiam) (*Jones III*). We now conclude that there was no *Miranda* violation. Accordingly, we affirm Jones' conviction.

### I.

### FACTUAL BACKGROUND

Testimony at the hearing on Jones' suppression motion revealed that the events which led to Jones' prosecution occurred in the 600 block of Newton Place, N.W. in Washington, D.C. on November 10, 1995. Officer Diane Groomes of the Metropolitan Police Department testified that on the evening in question, she drove into the area in a scout car. Upon arrival, she observed three men standing on the sidewalk. Officer Groomes testified that she saw one of the men, later identified as appellant Elton R. Jones, drop two ziplock bags to the ground. Two other officers who were in the scout car apparently also observed the drop. Officer Groomes stopped the car, and she and the other officers approached Mr. Jones and directed the other two men to go across the street.

The officers then focused their attention on Mr. Jones. One of the officers picked up the two ziplock bags that were lying at Jones' feet. The bags contained a white rock substance that later proved to be crack cocaine. The officers asked Jones "for his ID, if he had ID at that time, or if he didn't have his ID what is his name, address, where he lives, things like that." After these questions were posed to him,

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Jones stated that "all he does is drink" and that "he was holding for those two guys." At the time that he made these comments, Jones had not been advised of his rights under *Miranda*.[2]

After a field test of the suspected drugs indicated the presence of cocaine, Jones was placed in the police cruiser and transported to a police station; he was then released on citation. A week later, the United States Attorney filed an information charging Jones with misdemeanor possession of a controlled substance.

Through counsel, Jones filed a pretrial motion to suppress the incriminating statement that he had made at the scene, namely, that he was holding the drugs for someone else. On July 10, 1996, an evidentiary hearing was held on Jones' motion. During the presentation of the evidence,[3] the trial judge declared that, in her view, Jones was "in custody" for *Miranda* purposes at the time that he made the incriminating statement. After the parties had completed the presentation of their evidence, the judge found, in conformity with the testimony, that the police had not advised Jones of his rights pursuant to *Miranda*. Nevertheless, the judge denied Jones' motion to suppress:

> I credit the testimony of the police officer to the effect that prior to Mr. Jones making the statements that he made, that he had not been interrogated, and that the statements were spontaneous. That he volunteered this information about the fact that he was just drinking and that he was holding for someone else, and that it was not in

response to police interrogation that those statements were made.

> I credit the officer's testimony that once the drugs had been seized by one of her colleagues, that the only questions that were asked of Mr. Jones related to his identification[,] to his name. And that no questions—although at some point questions were asked about the drugs, according to [the officer's] testimony those questions were asked after the defendant had made the statements that are at issue here.

After the judge denied Jones' motion, the case proceeded to a non-jury trial on the merits. The trial judge found Mr. Jones guilty as charged and sentenced him to imprisonment for sixty days. Jones filed a timely notice of appeal.

## II.

### LEGAL DISCUSSION

■ The only issue before the en banc court is whether Jones' admission that he was holding the drugs was the product of custodial interrogation, and therefore subject to suppression on account of the failure of the police to advise Jones in advance of his rights pursuant to *Miranda*. The requirements of *Miranda* apply only if custodial interrogation has taken place; there must be both "custody" and "interrogation" at the same time. *See, e.g., California v. Beheler*, 463 U.S. 1121, 1123–25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam). The government contests each of these elements of "custodial

---

2. *After Jones had acknowledged "holding" the drugs, the officers asked him additional questions, e.g., "if he wanted to volunteer information on who[m] he bought it from, stuff like that." According to Officer Groomes, however, Jones "didn't want to say anything about that." It appears that the officers also posed these substantive questions* to Jones without giving him a *Miranda* warning, but by this time Jones had already made his incriminating statement.

3. Jones testified on his own behalf at the motions hearing, but the judge did not credit his testimony.

interrogation"; it argues that Jones was not in "custody," as that term is used for *Miranda* purposes,[4] and that, even if he was, the statement in question was volunteered and was not made in response to interrogation. We do not reach the question whether Jones was in custody, for we agree with the government that, even if he was, the incriminating statement was not a product of police interrogation. We further conclude that there was ample evidentiary support for the judge's finding that Jones' admission that he was holding the drugs for others was volunteered and spontaneous.

### A. The standard of review.

In reviewing the trial judge's denial of a motion to suppress statements on *Miranda* grounds, we defer to her findings of evidentiary fact. *In re E.A.H.*, 612 A.2d 836, 838 (D.C.1992). "[W]e review findings of historical fact only for clear error, and give due weight to inferences drawn from those facts by resident judges." *United States v. Guiterrez*, 92 F.3d 468, 471 (7th Cir.1996). Moreover, "the facts and all reasonable inferences therefrom" must be viewed in the light most favorable to the party that prevailed in the trial court. *Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc). As the government argues in its brief, "this [c]ourt must defer to Judge Beck's findings of fact, which establish what happened and determine the sequence of events." (Quotation marks omitted.)

But in this type of case, as in any other, this court must "determine the ultimate question of law de novo." *E.A.H.*, *supra*, 612 A.2d at 838. "Whether, on the duly established facts, [Jones] was subjected to custodial interrogation without the benefit of *Miranda* warnings is a question of law." *Reid v. United States*, 581 A.2d 359, 363 (D.C.1990). More particularly, "[t]he question whether [Jones'] rights were scrupulously honored, including whether police conduct constitutes interrogation, is a question of law." *Stewart v. United States*, 668 A.2d 857, 863 (D.C. 1995) (quotation marks omitted). "Accordingly, we review de novo the [trial] judge's determination that the [questioning] of [Jones] regarding his identity did not violate the strictures of *Miranda*." *Thomas v. United States*, 731 A.2d 415, 422 (D.C. 1999).

### B. Application of Miranda standard to Jones' statement.

In its seminal decision in *Miranda*, the Supreme Court expressed concern that the advent of modern police interrogation may have resulted in the generation of coerced confessions. *Miranda*, *supra* note 1, 384 U.S. at 445–58, 86 S.Ct. 1602; *see also Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The Court was of the opinion that "the coercion inherent in custodial interro-

---

4. "In order to constitute 'custody' for *Miranda* purposes, the suspect must be subject to the 'functional equivalent of formal arrest.'" *Mitchell v. United States*, 746 A.2d 877, 890 (D.C.2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)); *see also Morris v. United States*, 728 A.2d 1210, 1216 (D.C. 1999). At the motions hearing, the trial judge advised Jones' attorney during the presentation of the evidence that "I'm prepared to find that [Jones] was in custody based on the testimony you've already gotten." Rightly or wrongly, the prosecutor did not challenge this finding. Indeed, during the argument, the prosecutor affirmatively referred to Jones as having been in custody at the time Jones admitted holding the drugs. In light of our disposition of the appeal on other grounds, we need not determine whether the government may now seek to avoid its arguably improvident concession. *Cf. Jones I, supra*, 726 A.2d at 191 (concurring opinion).

gation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." *Dickerson, supra,* 530 U.S. at 435, 120 S.Ct. 2326 (quoting *Miranda,* 384 U.S. at 439, 86 S.Ct. 1602) (ellipsis and quotation marks omitted). The Court laid down "concrete constitutional guidelines for law enforcement agencies and courts to follow." *Miranda, supra,* 384 U.S. at 442, 86 S.Ct. 1602. Under these guidelines, the admissibility in evidence of any statement obtained during the custodial interrogation of a suspect would depend on whether the police had advised the suspect, in advance, of certain specified rights which are accorded to him by the law.[5]

■ In formulating these guidelines, the Supreme Court made it clear that

[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda, supra,* 384 U.S. at 478, 86 S.Ct. 1602; *see also Mitchell, supra* note 4, 746 A.2d at 891.

■ Fourteen years after *Miranda,* the Supreme Court undertook to elaborate upon the meaning of "interrogation" as used in that landmark decision:

[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Innis, supra,* 446 U.S. at 301, 100 S.Ct. 1682 (footnotes omitted). In the present case, Jones and the government both rely on the Court's definition of "interrogation" in *Innis,* but they differ as to the meaning of the Court's language and as to its application to the present record.

According to Jones, the quoted passage from *Innis* means that interrogation includes *all* express questioning, and not simply questioning that police should know is reasonably likely to elicit an incriminating response. In Jones' view, the qualifying words in the latter part of the quoted sentence do not apply to "express questioning," but only to other "words or actions." *Id.* at 301, 100 S.Ct. 1682. This means, as Jones sees it, that the police may not ask a suspect in custody any question at all, no matter how unlikely it is to elicit an incriminating response, without first apprising him of his rights under *Miranda.*[6] Such a construction of the crit-

---

5. The suspect must be advised "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda, supra,* 384 U.S. at 479, 86 S.Ct. 1602. This familiar recitation has come to be known as a *"Miranda* warning."

6. Jones' counsel accepts, as she must, the proposition that there are certain recognized exceptions to *Miranda. See, e.g., New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (public safety exception); *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (plurality opinion) (routine booking question exception); and possibly *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (*Miranda* warning not required where

ical sentence in *Innis* may be plausible as a matter of syntax, but it has been rejected by numerous authorities, and we do not find it persuasive.

■ In *United States v. Bogle*, 325 U.S.App.D.C. 63, 114 F.3d 1271, *cert. denied*, 522 U.S. 938, 118 S.Ct. 350, 139 L.Ed.2d 272 (1997), the United States Court of Appeals rejected a contention essentially identical to the one urged upon us by Jones. The court relied on authorities holding that

> even in cases involving express questioning, there is no interrogation triggering the protections of *Miranda* unless, in the totality of the circumstances, the officer's questions were "reasonably likely to elicit an incriminating response." (Citations omitted.)

We agree with these circuits that only questions that are reasonably likely to elicit incriminating information in the specific circumstances of the case constitute interrogation within the protections of *Miranda*. As the Supreme Court explained in *Innis*, " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300[, 100 S.Ct. 1682]. . . . A question that is not likely to elicit an incriminating response is not inherently coercive and therefore should not trigger the protections of *Miranda*.

*Bogle, supra*, 325 U.S.App.D.C. at 67, 114 F.3d at 1275; *see also United States v. Edwards*, 885 F.2d 377, 385–86 (7th Cir. 1989) ("In our opinion, questions such as 'what is your name?' and 'where do you live?' will not usually constitute interrogation within the meaning of *Miranda*"; this is true even if these questions are asked at the time of arrest, rather than during the booking process); *Guiterrez, supra*, 92 F.3d at 471 ("Prior to or after arresting a suspect, law enforcement officers may ask preliminary questions as to identity, but they may not conduct a custodial interrogation"); *United States v. Foster*, 227 F.3d 1096, 1102–03 (9th Cir.2000) ("a definition of interrogation that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself; [o]nly questions reasonably likely to elicit an incriminating response from the suspect amount to interrogation") (citations and quotation marks omitted; punctuation altered for clarity); *see generally* WAYNE R. LaFAVE ET AL., CRIMINAL PROCEDURE § 6.7(b), at 546, 550–53 (2d ed. 1999 & Supp.2001). We agree with these authorities,[7] and we therefore conclude that Jones was not subjected to custodial interrogation before he made his incriminating statement.

■ Jones appears to contend that the actions of the officers in approaching Jones, telling the other men to cross the street, picking up the drugs, and asking

---

officer poses as suspect's cellmate). According to Jones, *Miranda's* prophylactic rule permits questions authorized by these decisions, but no others, without prior advice of *Miranda* rights.

We cannot agree that such an inflexible result was intended either in *Miranda* or in *Innis*. Moreover, we do not believe that the "routine booking exception" recognized in *Muniz* is really an "exception" in the sense that it excuses compliance with *Miranda*. Rather, *Muniz* is more readily understood as an application of *Miranda* principles. Ordi-

narily, questions posed to a suspect regarding his identity are not reasonably likely to elicit an incriminating response. In circumstances where such questions may reasonably be expected to elicit incriminating information, however, *Miranda* warnings are required. *See Thomas, supra*, 731 A.2d at 423–26, and our discussion; *infra*, pp. 283–284.

7. Our agreement with the reasoning of *Bogle, supra*, is further reinforced by notions of comity. *Cf. Hornstein v. Barry*, 560 A.2d 530, 536–37 n. 15 (D.C.1989) (en banc).

Jones his name collectively amounted to interrogation. But when the officers observed Jones engage in what reasonably appeared to them to be criminal activity, it was surely their duty to approach him, rather than to ignore the event and to allow a suspect to depart. It was likewise entirely reasonable to take possession of the contraband and to order civilians who apparently were not directly involved to leave the immediate location where Jones was being apprehended. If asking Jones his name, standing alone, did not constitute interrogation within the meaning of *Miranda,* then the above-described actions on the part of the officers prior to the request that Jones identify himself did not convert a simple "what's your name" inquiry into interrogation reasonably likely to elicit an incriminating response. If we were to accept Jones' context-based contentions, then routine, conventional, and altogether appropriate conduct on the part of law enforcement officers would run afoul of *Miranda* even where no incriminating statement was sought or reasonably likely to be elicited.

We do not suggest that a request that a suspect identify himself can *never* contravene *Miranda* where such an inquiry is posed before the suspect has been advised of his rights. For example, in the very case in which we recognized the "routine booking exception" to *Miranda, Thomas, supra,* 731 A.2d at 420–21, we held that, in the particular context of that case, the extensive questioning of the defendant as to his identity—*i.e.,* whether he was the "Tony" being sought by the police—was reasonably likely, and indeed intended, to elicit an incriminating response. *Id.* at 421–26. The circumstances under which

Jones was asked to identify himself, however, bore no resemblance to the situation in *Thomas,* or to those in the other decisions cited in *Thomas,* 731 A.2d at 423–26, in which inquiries regarding the defendant's identity were held to be in violation of *Miranda.*

▇▇▇ In this case, the trial judge, who observed the witnesses and heard their testimony, found that Jones' statement was "spontaneous" and that Jones "volunteered" the information that he had been holding the drugs. Given the lack of the slightest logical nexus between the officer's question and the defendant's statement, it is difficult to understand how the judge could reasonably have found otherwise. In any event, the judge's findings are fully supported by the evidence, and we perceive no error of law.

*Affirmed.*

REID, Associate Judge, dissenting:

I am unable to agree with my colleagues' apparent characterization of the matter before us as a simple "request for identification" case. Nor am I able to agree with their application of fundamental legal principles to Mr. Jones' case. Therefore, like my colleague, Judge Mack, I respectfully dissent.

In this unusual en banc case,[1] we are asked to decide whether the police interrogated Mr. Jones without *Miranda* warnings, and, if so, whether the trial court committed reversible error in denying his suppression motion. Under *Miranda,* any statements that Mr. Jones made during custodial interrogation are inadmissible "unless he was warned prior to any questioning that he ha[d] the right to remain

---

1. I believe that the difficulties presented by *this case* are a function of the state of the record before us rather than of a gap in the controlling law. More than in most cases, close study of this record leaves one with unanswered questions and a sense of frustration.

silent, [and] that anything he sa[id] c[ould] be used against him in a court of law." *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In my view, essential to a *Miranda* analysis is the factual context of this case.

According to Officer Groomes' testimony, credited by the trial court, three uniformed police officers saw a "panicked" suspect drop drugs on the ground beside him as they approached. Two other men were with Mr. Jones. Officer Groomes, who knew the two other men "real well," instructed them to go across the street. Another officer picked up the drugs from the ground in full view of Mr. Jones, who remained standing near where the drugs had fallen. The officers surrounded Mr. Jones, and thus, he was isolated from his companions. The officers arranged for field testing and then continued to stand on the street with the appellant for approximately fifteen minutes.

Both the officers and Mr. Jones knew that he was being held pending arrest when the field testing of the drugs was complete. Without giving the *Miranda* warnings, the officers began to question Mr. Jones, first requesting identification and then attempting to find out about the drugs specifically. Viewed in overall perspective, it seems indisputable that the officers' actions violated both the spirit and the letter of *Miranda.*

Based on Officer Groomes' testimony, the trial court determined that the "timing" of Mr. Jones' incriminating statement warranted denial of the motion to suppress. Mr. Jones' statement that he was just "holding" the drugs came just after the identification questioning but before the police began express questioning about the drugs: After picking up the drugs, the officers asked for the suspect's ID or his name and address. At that point, Mr. Jones "spontaneous[ly]" "volunteered" that

he was merely "holding" for the other guys. Only after that point did the officers ask whether Mr. Jones wanted to "volunteer" further information about the drugs. Although the government concedes that the latter questioning was interrogation, the argument is that the later-asked questions cannot taint the statement that Mr. Jones made, whether it is considered as a spontaneous remark or as, at most, a non sequitur response to "what is your name?" For the reasons explained below, I take little comfort in the "timing" analysis.

In its approach to this case, the majority does not reach the issue of whether Mr. Jones was in custody because it finds that his statement was not elicited by interrogation. To reach that conclusion, the majority reasons that *Miranda* will not ordinarily protect a suspect who is being asked identity questions, because such questions are not, as a rule, reasonably likely to elicit incriminating information. Here the majority relies heavily on the D.C. Circuit's opinion in *United States v. Bogle,* 325 U.S.App.D.C. 63, 114 F.3d 1271 (1997). The majority further rejects any suggestion that the overall context was so coercive as to be the functional equivalent of express interrogation. In their view, the officers' conduct was "routine," "conventional," and "altogether appropriate."

I wholeheartedly disagree with the latter point and would reverse on the basis that the overall context was the functional equivalent of express interrogation. But I am troubled by several other aspects of the majority's analysis as well.

I note, first, that the majority's analysis takes *Bogle* far beyond its specific holding. *Bogle* itself did not turn on whether a particular *type* of question might be presumptively excepted from the *Miranda* requirements. Rather, it was concerned with whether the police could question a

suspect about what they believed in good faith to be an unrelated crime. In *Bogle*, the defendant was being held for murder. 325 U.S.App.D.C. at 64, 114 F.3d at 1272. A police detective who was not directly concerned with that murder, but was investigating the murder of Bogle's brother, wanted to talk with Bogle. *Id.* Bogle had previously invoked his right not to answer questions about the crime for which he was accused. *Id.* The detective began by carefully explaining to Bogle that he wanted to discuss the brother's murder only. *Id.* Apparently, however, Bogle spontaneously confessed to the murder for which he was being held at the time. *Id.* The D.C. Circuit determined that the detective had not thought that the two murders were connected, so that the detective would not have foreseen that Bogle might incriminate himself. 325 U.S.App.D.C. at 67, 114 F.3d at 1275. The detective's questions were not likely to elicit an incriminating response, and, thus, did not constitute interrogation within *Miranda*'s meaning. *Id.*

In contrast to our situation, the *Bogle* court was concerned with questioning about a different and apparently unrelated crime. To the extent that the *Bogle* court discussed the significance of biographical questions, its views are essentially dicta. As support for its analysis, the *Bogle* court did reference some cases that involved the narrow "routine booking exception" announced in *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), but none of the cases cited by *Bogle* involved fact patterns similar to the instant one.

My reading of *Muniz*, moreover, reveals little support for treating identification questions as presumptively exempt from *Miranda*'s concerns. *Muniz* involved a motorist who was stopped for driving under the influence. 496 U.S. at 585, 110 S.Ct. 2638 (plurality opinion). A central issue before the *Muniz* Court was whether booking questions about name, address, height, weight, eye color, date of birth, and current age were subject to *Miranda*'s protections. *Id.* at 586–87, 110 S.Ct. 2638. There were three views among the justices. One four-justice plurality adopted the routine booking exception "which exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Id.* at 601–02, 110 S.Ct. 2638. The plurality justices rejected the argument, however, that those questions would never constitute custodial interrogation "merely because the questions were not intended to elicit information for investigatory purposes." *Id.* Another group of four justices saw no need to invoke a "routine booking exception" because the Muniz' answers were not "testimonial": The questions did not put Muniz in the position of deciding between the options of lying, remaining silent, or giving incriminating testimony about his name or address, for example. *Id.* at 608, 110 S.Ct. 2638 (Rehnquist, C.J., concurring in part and dissenting in part). Rather, they simply probed his impaired ability to answer, analogous to a blood alcohol test. *Id.* These four justices did not comment on whether they would recognize a routine booking exception in a different case. One justice disagreed entirely that there should be any categorical exemption for such biographical questions. *Id.* at 608, 110 S.Ct. 2638 (Marshall, J., concurring in part and dissenting in part). Among these diverse views, however, none even suggests that the questions' status under *Miranda* should be analyzed primarily from the standpoint of their subject matter. Rather, each group of justices focused on the context in which the questions were asked.

Here, of course, the issue is not whether Mr. Jones was illegally compelled to divulge his name and address. Nor is this even a case in which the suspect's name or address would likely have given away some incriminating detail. Thus, it seems more appropriate to analyze this case under the rubric of "spontaneous" or "volunteered" statements. If it were indeed clear that Mr. Jones' statement was not improperly compelled by psychological pressures, it would undoubtedly be admissible. The Supreme Court in *Miranda* stated that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 86 S.Ct. 1602; *see also Mitchell v. United States,* 746 A.2d 877, 890–91 (D.C.2000). All other things equal, courts will deem a nonresponsive answer to an officer's question to be "volunteered" and therefore admissible, notwithstanding a lack of *Miranda* warnings. For example, the statement "But you didn't catch me driving" is not responsive to an officer's request that a suspect undergo field sobriety testing, nor is such a request likely to elicit an incriminating response. *State v. Messner,* No. 00–1420–CR, 2001 WI App. 146, 630 N.W.2d 275, at ¶¶ 5, 17 (2001) ("[T]he only response an officer could reasonably anticipate . . . is 'yes' or 'no.' "); *see also, e.g., United States v. Castro,* 723 F.2d 1527, 1530–31 (11th Cir.1984); *United States v. Thomas,* 961 F.Supp. 43, 45–46 (W.D.N.Y.1997); *cf. State v. Mitchell,* 167 Wis.2d 672, 686–90, 482 N.W.2d 364, 369–71 (1992). Thus, if it were not for the larger context, which my colleagues discount as the product of "routine, conventional and altogether appropriate conduct on the part of law enforcement officers," I would agree that the refusal to suppress Mr. Jones' statement should be affirmed.

This analytical approach must give way, however, when it becomes apparent that the situation "reflect[s] a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In such a case, it begs the question to observe that the suspect's answer was nonresponsive. *Cf. United States v. Espinal–Cardona,* 635 F.Supp. 330, 334–35 (D.N.J.1986). The issue becomes whether the police improperly "us[ed] the coercive nature of confinement to extract [an admission] that would not be given in an unrestrained environment." *Arizona v. Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). "[C]ourts must be alert to the subtle forms that interrogation may assume . . . ." *Mitchell,* 746 A.2d at 891. "The test for whether police remarks are the functional equivalent of express questioning is an objective one, which 'focuses primarily upon the perceptions of the suspect, rather than the intent of the police.' " *Mitchell,* 746 A.2d at 891.

Here, Mr. Jones, already in a "panicked" state, was isolated as a result of police instruction to the other two men to go across the street. Mr. Jones was surrounded by several officers. He had just seen one officer pick up the drugs next to his feet, and hold them in his hand. This might be a different case if the officers had asked only for identification and not proceeded to conduct an express interrogation. But they did continue to pose questions while Mr. Jones stood in the street. We may infer from the officers' further questions that the request for identification signaled the beginning of a conversation to investigate the crime that they had witnessed. Considering the totality of the circumstances, it is difficult to characterize the overall situation as anything other than an inquisitorial session in which Mr. Jones felt compelled to explain himself, and, consequently, made an admission that

he would not willingly have made under less coercive circumstances. I would conclude that the government has failed to carry its burden of persuasion that Mr. Jones was not being subjected to interrogation before the express questions about the drugs were put to him.

In analyzing this case, I deem it important that the Supreme Court recently observed in *Dickerson v. United States* that: "*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture." 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (reference omitted). Judge Mack also recognizes the quintessential place of *Miranda* in our jurisprudence. In light of the fundamental importance of *Miranda,* I am constrained to recognize that the cost to the police of giving the *Miranda* warnings would have been minimal in this case, as it usually is. I therefore conclude that, in the context of this case, Mr. Jones should have received the *Miranda* warnings prior to the initiation of identification questioning that signaled the beginning of a conversation to investigate the crime that the police had witnessed. Consequently, I respectfully dissent.

MACK, Senior Judge, dissenting:

Pursuant to our previous opinions and for many of the reasons expressed in Judge Reid's dissent, I believe the facts of this case satisfy the "functional equivalent" prong of *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).[1] "[T]he three officers should have known that their actions in approaching and isolating appellant, retrieving the two plastic drug bags [in front of appellant], and immediately asking appellant for iden-

tification would likely compel an explanation regarding ownership of the drugs." *Jones v. United States,* 747 A.2d 558, 562 (D.C.1999). Accordingly, I respectfully dissent.

However, this case provides a good opportunity to comment on how far this court (and others) has departed from the directives (reaffirmed and explained) of the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Innis, supra.* While it can fairly be said that this court, as an institution, takes pride in its strict adherence to precise statutory and judicial language, in the instant case, the majority, relying primarily on legal reasoning of court decisions in other jurisdictions, appears to be ignoring the fundamental legal principles it purports to refine.

A paradox meets us initially. The majority tells us that the *Miranda* warnings apply only if "custodial interrogation" exists, *i.e.,* there must be "custody" and "interrogation" at the same time. Yet, the majority does not reach the question of "custody" (a question vigorously debated throughout this litigation) because it agrees with the government that, even if the defendant were in custody, his incriminating statement was not the product of police interrogation. That approach, *i.e.,* to not even recognize the impact of custody on this case, arguably catapults us back, historically, to the very reasons for the promulgation of the *Miranda* rules and their constitutional underpinnings.

While the starting point for the definition of interrogation in this context is obviously the *Miranda* decision itself, the most instructive precedent for the scope of that definition is the Supreme Court's decision

---

1. Some courts refers to the two components to the definition of interrogation in *Innis*—express questioning and the functional equiv-

alent thereof—as the first and second prongs, respectively. *See Innis, supra,* 446 U.S. at 301, 100 S.Ct. 1682.

in *Innis*. In *Miranda*, the Court stated, "[by] custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602 (emphasis added); *see also Innis, supra*, 446 U.S. at 298, 100 S.Ct. 1682. As the Court later noted in *Innis*, this language "and other references throughout the [*Miranda*] opinion to 'questioning' might suggest that the *Miranda* rules were to apply only to those police interrogation practices that *involve express questioning of a defendant while in custody*." *Innis, supra*, 446 U.S. at 298, 100 S.Ct. 1682. After examining the policies behind the *Miranda* decision, however, the Court in *Innis* chose not to "*limit* the ambit of *Miranda* to express questioning;" *id.* at 299 n. 3, 100 S.Ct. 1682, rather, it held that *Miranda* is implicated "whenever a person in custody is subjected to *either* express questioning *or* its functional equivalent." *Id.* at 300, 100 S.Ct. 1682 (emphasis added). Specifically, the Court in *Innis* observed:

> [T]he term 'interrogation' under *Miranda* refers *not only* to express questioning, *but also* to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Id.* at 301, 100 S.Ct. 1682 (emphasis added) (footnotes omitted). Therefore, in *Innis*, the Supreme Court *expanded* the definition of custodial interrogation as contemplated in *Miranda*, rather than, as the majority's holding accomplishes, scaled back that definition. *See Derrington v. United States*, 488 A.2d 1314, 1326 n. 9 (D.C.1985), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988).

To this day, the *Innis* decision remains the most probative Supreme Court authority on "*Miranda* interrogation." By my count, the *Innis* majority, on at least three occasions, used language indicating that express questioning satisfies the definition of interrogation under *Miranda*. *See Innis, supra*, 446 U.S. at 298, 299 n. 3 & 302, 100 S.Ct. 1682; *see also Innis, supra*, 446 U.S. at 313–14, 100 S.Ct. 1682 (Stevens, J., dissenting) (noting that the definition of interrogation set forth by the majority includes express questioning that, if it was not in the form of a direct question, might not fit within the "reasonably likely to elicit an incriminating response" language of the functional equivalent prong). Nowhere in the opinion does the *Innis* majority indicate that a specific type of express question is necessary to implicate the protections of *Miranda*. Nor does the court suggest that the qualifying language of the "functional equivalent" test (words or actions that the police should know are reasonably likely to elicit an incriminating response and that are other than those normally attendant to arrest and custody) applies to express questioning. Quite the opposite, the court indicated on the facts before it that "[i]t is undisputed that the first prong of the definition of 'interrogation' [the express questioning prong] was not satisfied, for the conversation between [the police officers] included *no* express questioning of the respondent." [2] *Innis, supra*, 446 U.S. at 302, 100 S.Ct. 1682.

---

**2.** The *Innis* majority then proceeded to hold that the conversation between the two police officers, discussing the possibility that a child could find the shotgun and inflict harm on himself/herself or others, did not qualify as the functional equivalent of express questioning. *See Innis, supra*, 446 U.S. at 303, 100 S.Ct. 1682.

Yet, the majority summarily dismisses Jones's argument predicated on the above language as "plausible as a matter of syntax" but unpersuasive.

It is true that the Supreme Court has recognized a few limited situations where the prophylactic protections of *Miranda* are not (or might not be) triggered despite the existence of custodial interrogation. The only such exception arguably applicable to this case is the so-called "routine booking exception," recognized by this court in *Thomas v. United States*, 731 A.2d 415, 421 (D.C.1999), and articulated by Justice Brennan's plurality opinion in *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).[3] This exception, if it can be called one, "exempts from *Miranda's* coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Muniz*, 496 U.S. at 601, 110 S.Ct. 2638 (internal quotation marks omitted); *Thomas, supra*, 731 A.2d at 421. An examination of its roots reveals that it was a limited exception created to facilitate the administrative duties of the police at the station house. *See Muniz*, 496 U.S. at 601–02 & n. 14, 110 S.Ct. 2638; *Thomas, supra*, 731 A.2d at 421. Therefore, consistent with our case law, preliminary, biographical, or "routine" questions to an accused in custody *outside of the booking procedure* and not *designed* to assist the booking process still must be preceded by a *Miranda* warning in order to obtain admissibility. *See Brewster v. United States*, 271 A.2d 409, 412 n. 6 (D.C.1970); *Proctor v. United States*, 131 U.S.App.D.C.

241, 242–43, 404 F.2d 819, 820–21 (1968). In *Brewster, supra*, we observed that

> whether [a question] is routine is not a relevant consideration. *Miranda* applies to custodial interrogation. Routine questions, no matter how innocuous they may seem, are part of an interrogation. The fact that an interrogation contains nothing but routine questions does not make it any less an interrogation; nor, more emphatically, does the quality of routineness suspend fifth amendment rights.

271 A.2d at 412 n. 6; *see also Thomas, supra*, 731 A.2d at 420. Outside of the booking context, I fail to see how " 'the philosophical basis' of *Proctor* and *Brewster* has been substantially undermined by *Muniz* and its progeny." *Thomas, supra*, 731 A.2d at 421.

Moreover, contrary to the impression given by our decision in *Thomas, supra*, and the majority's decision in this case, the Brennan plurality in *Muniz* seemed to view the routine booking questions at issue as custodial interrogation, but nevertheless *exempted* such interrogation from the protections of *Miranda*. In *Thomas*, a panel of this court wrote, "The [Brennan] plurality specified that questions posed by the police to the defendant regarding his name, address, height, weight, eye color, date of birth and current age *did not qualify as 'custodial interrogation.'* " *Id.* at 421 (emphasis added). This characterization is somewhat misleading as Justice Brennan wrote in *Muniz*:

> We disagree with the Commonwealth's contention *that Officer Hosterman's first*

---

**3.** As the Supreme Court has not recognized the routine booking exception, I have serious questions, particularly in light of *Dickerson v. United States*, whether it exists. *See* 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Given that *Miranda's* effectiveness is predicated on its bright-line application and that, accordingly, courts should be loathe to create exceptions to the *Miranda* doctrine, nothing in the Supreme Court's jurisprudence leads me to conclude that a "routine booking exception" was created in *Muniz*. In any event, assuming, *arguendo*, it does exist, as a large number of courts believe it does, it should be properly limited—in terms of content, context and scope.

*seven questions regarding Muniz's name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation as we defined the term in Innis, supra, merely because the questions were not intended to elicit information for investigatory purposes ... We agree with amicus United States, however, that Muniz's answers to these first seven questions are nonetheless admissible because the questions fall within a routine booking question exception which exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services ... In this context, therefore,. the first seven questions asked at the Booking Center fall outside the protections of Miranda and the answers thereto need not be suppressed.*

*Muniz, supra,* 496 U.S. at 601–02, 110 S.Ct. 2638 (emphasis added) (citations and internal quotation marks omitted). The import of this language is that routine booking questions do satisfy the definition of custodial interrogation under *Innis* and *Miranda,* but, in consideration of "the police's administrative concerns," are *exempted* from the evidentiary safeguards of *Miranda.*[4] *Id.* at 601–02, 110 S.Ct. 2638. Yet, in two unsupported sentences in footnote 6, the majority in the instant case dismisses this "exception" language and the argument predicated thereon. Without citing any support, the majority states, "*Muniz* is more readily understood as an application of *Miranda* principles" rather than "an 'exception' in the sense that it excuses compliance with *Miranda.*"

On the other hand, common sense dictates that questions which have no logical nexus to either the suspect or the underlying events—"What's the score of the Redskins game?" or "Isn't this weather beautiful?"—should not be considered "express questioning" under *Miranda.*[5] Inherent in the Court's jurisprudence, as the Court remarked in *Innis,* is that " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis, supra,* 446 U.S. at 300, 100 S.Ct. 1682. The necessary compulsion cannot be found in questions having no logical connection to the operative series of events or those involved therein. Relatedly, as Judge Reid notes, *Miranda* also indicated that "[v]olunteered statements" given without "compelling influences" are not barred by the Fifth Amendment. *Miranda, supra,* 384 U.S. at 478, 86 S.Ct. 1602; *see Mitchell v. United States,* 746 A.2d 877, 890–91 (D.C.2000). In this regard, our decision in *Morris v. United States,* 469 A.2d 432, 437–38 (D.C. 1983), is instructive. At the time of Morris's arrest, he was advised of his *Miranda* rights, as Jones should have been in the instant case. Morris remained silent. When transported to the Homicide Office for interrogation, a detective (with knowledge of his prior warnings) exchanged greetings and a spontaneous confession followed. We ruled his confession was not a product of custodial interrogation. *See Morris, supra,* 469 A.2d at 437–38.

In this case, however, the questions asked of Jones: (1) were not made to facilitate booking; (2) directly implicated

4. There is an argument that the word "merely" suggests a contrary conclusion. Yet, at best this language is ambiguous, and particularly in light of the later use of the word "exempts," the entire passage does not support the unequivocal statement found in

*Thomas, supra,* and the majority opinion herein.

5. As was evident during oral argument, one can design numerous hypotheticals to test the definition of custodial interrogation under *Miranda* and its progeny.

Mr. Jones and the relevant events; and (3) reflected a significant measure of compulsion magnified by the context in which they were asked. The government appears to concede that the biographical questions asked of Jones were not for administrative booking or pretrial purposes, but rather for investigatory purposes. Instead, the government advocates for the creation of a new legal construct—namely that there should be a presumption that the booking exception applies to all questions that *could be asked in a booking context.* This presumption, according to the government, can be rebutted upon demonstration that such questions were reasonably likely to elicit an incriminating response. The government, however, has failed to provide any authority for its theory, which amounts to an expansion of an exception to the *Miranda* doctrine recognized by this court in *Thomas, supra,* but predicated on a plurality decision of the Supreme Court.

While it is clear that the biographical questions asked of Jones logically relate to him and his predicament, it is equally evident that Officer Groomes's queries were not made to facilitate booking. The questions were asked at the scene. There was no testimony that they were designed to assist any of the officers in the completion of booking or other administrative forms. They were asked of a person whom the police had witnessed, seconds before, drop a clear zip-lock bag, and who had just picked up a beer bottle. They were asked after the police had separated Jones from the others at the scene. They were asked with three police officers present. They were asked soon after the police had picked up the plastic bag in front of Jones. Finally, they were asked of a person who was so affected, he picked up a nearby container of alcohol and either drank or feigned drinking directly in front of the police. In short, they were asked in a situation rife with "compelling influences." *Miranda, supra,* 384 U.S. at 478, 86 S.Ct. 1602.

It must be noted that in *United States v. Bogle,* 325 U.S.App.D.C. 63, 114 F.3d 1271 (1997), the D.C. Circuit refused "to adopt a per se rule that all express questions constitute interrogation," holding instead that "only questions that are reasonably likely to elicit incriminating information in the specific circumstance of the case constitute interrogation within the protections of *Miranda.*" *Bogle, supra,* 325 U.S.App.D.C. at 66–67, 114 F.3d at 1274–75. As support for its holding, however, the D.C. Circuit primarily relied upon cases recognizing the routine booking exception. *See, e.g., United States v. Ventura,* 85 F.3d 708, 712 n. 5 (1st Cir.1996); *United States v. Sweeting,* 933 F.2d 962, 965 (11th Cir.1991). To the extent, therefore, that the D.C. Circuit held in *Bogle* that express questioning designed to serve an administrative purpose at the station house does not trigger *Miranda's* protections, our decision in *Thomas, supra,* albeit precarious, is consistent. To the extent, however, that the *Bogle* opinion more generally held, as it seems to, that "only questions that are reasonably likely to elicit incriminating information ... constitute interrogation within the protections of *Miranda,*" it is peculiar that there is very little textual analysis of the fundamental Supreme Court precedent. *Bogle, supra,* 325 U.S.App. D.C. at 67, 114 F.3d at 1275. Decisions of the United States Court of Appeals for the D.C. Circuit are entitled to great respect, *see M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971), and a regime where a criminal defendant in federal court in the District of Columbia does not have *Miranda* protections coextensive with those of a criminal defendant in the Superior Court is not optimal. However, the *Miranda* protections are such an important part of crimi-

nal jurisprudence that these formidable considerations do not warrant resigned silence.

Finally, the *Miranda* doctrine does not exist in a vacuum. Aside from the obvious implications for those in custody, Fifth Amendment jurisprudence substantially affects other facets of constitutional criminal procedure as well. For example, in the recently decided case of *Texas v. Cobb*, both Chief Justice Rehnquist, writing for the majority, and Justice Kennedy, in his concurrence, relied heavily on *Miranda's* fundamental safeguards to support their respective opinions limiting the scope of a defendant's Sixth Amendment right to counsel, once attached, to like "offense[s] under the *Blockburger [v. U.S.*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306] test." 532 U.S. 162, 121 S.Ct. 1335, 1343, 149 L.Ed.2d 321 (2001). Both appeared to view the protections afforded by *Miranda* as a safety net for situations not implicating the "offense-specific" Sixth Amendment. *See Cobb, supra*, 121 S.Ct. at 1342 n. 2 (Rehnquist, C.J.) ("Even though the Sixth Amendment right to counsel has not attached to uncharged offenses, defendants retain the ability under *Miranda* to refuse any police questioning, and, indeed, charged defendants presumably have met with counsel and have had the opportunity to discuss whether it is advisable to invoke those Fifth Amendment rights. Thus, in all but the rarest of cases, the Court's decision today will have no impact whatsoever upon a defendant's ability to protect his Sixth Amendment right."); *Cobb, supra*, 121 S.Ct. at 1344 (Kennedy, J., concurring) ("[I]t is difficult to understand the utility of a Sixth Amendment rule that operates to invalidate a confession given by the free choice of suspects who have received proper advice of their *Miranda* rights but waived them nonetheless."). The *Cobb* decision makes clear that we should be cognizant of the fact that any

decision impacting the scope of *Miranda* also has a domino effect on other fundamental areas of criminal law. *Cf. Dickerson, supra*, 530 U.S. at 443–44, 120 S.Ct. 2326.

As the Supreme Court recently reaffirmed in its decision recognizing the constitutional significance of *Miranda*, the *Miranda* doctrine is premised on a bright-line application of a prophylactic rule. *See Dickerson, supra*, 530 U.S. at 444, 120 S.Ct. 2326. A rule limiting the "express questioning" prong of *Innis* to questions reasonably likely to elicit an incriminating response, in my view, departs from law we are obligated to follow, and is contrary to the bright-line policy behind *Miranda*.