**UNITED STATES of America, Appellee,**

v.

**Clifford Theophilus BOGLE, Appellant.**

**No. 96–3082.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 24, 1997.

Decided June 17, 1997.

Richard K. Gilbert, appointed by the court, argued the cause and filed the briefs for appellant.

Barbara J. Valliere, Assistant U.S. Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., U.S. Attorney, John R. Fisher, and Thomas C. Black, Assistant U.S. Attorneys, were on the brief.

Before GINSBURG, SENTELLE, and HENDERSON, Circuit Judges.

D. H. GINSBURG, Circuit Judge:

The appellant challenges his convictions for second degree murder while armed, possession of a firearm during a crime of violence, assault on a federal officer, and use of a firearm during a crime of violence, on the grounds that the district court erroneously denied his motion to suppress an incriminating statement he made to the police on the night of his arrest and improperly refused to admit a prior inconsistent statement of the Government's rebuttal witness. We hold that the district court correctly denied the appellant's suppression motion because the appellant was not being interrogated when he made the incriminating statements, and that the district court's decision not to admit into evidence the prior inconsistent statement was, if an error, harmless. Accordingly, we affirm the judgment of the district court.

## I. BACKGROUND

The facts of this case are largely undisputed. The appellant's brother, Delroy Bogle, was murdered on June 5, 1995. That same day the appellant, a California resident, flew to D.C. in order to make funeral arrangements.

On June 8 at around 2 p.m. undercover police officers heard gunshots and saw a man later identified as Cordell Johnson limping down the street and another man later identified as the appellant running right behind him. Bogle shot Johnson several times; when Johnson collapsed to the ground, Bogle shot him again and continued running. The officers chased Bogle, exchanged gunfire, lost sight of him, and around 4:30 p.m. captured him.

Six hours after Bogle was arrested and placed in police custody he met with Detective Lazaro Gonzales. The detective told the appellant that the police had a lot of evidence against him and that, although he did not need to talk to Bogle, he would like to hear his version of what happened. At that point Detective Gonzales read the appellant his *Miranda* rights from a card containing four

questions and a space after each for the suspect to write "yes" or "no." When the detective asked Bogle the first two questions, "Have you read or had read to you the warning as to your rights?" and "Do you understand these rights?," Bogle wrote "yes" in the corresponding spaces. When the detective asked the appellant, "Do you wish to answer any questions?," Bogle said that he did not want to talk then and complained of a toothache. In response to the question, "Are you willing to answer questions without having an attorney present?," Bogle reiterated he did not want to talk right then, added that he would talk later, and requested something for his toothache. The detective told Bogle that he would have to go to a hospital to receive treatment for his toothache; Bogle then signed the bottom of the rights card. Detective Gonzales left and did not speak to Bogle again.

That same night Detective Robert Louis Parker asked Detective Gonzales if he could speak to Bogle about the murder of Bogle's brother Delroy. Detective Gonzales told Detective Parker that Bogle had already been read his *Miranda* rights and that Bogle had said that he did not want to talk about the Cordell Johnson murder; Detective Gonzales then introduced the appellant to Detective Parker around midnight. Detective Gonzales told Bogle that Detective Parker wanted to talk to him about the murder of his brother and then left Detective Parker and the appellant alone in the room. Detective Parker told the appellant that he was investigating the murder of his brother and that he wanted to talk to him only about that murder and not about Johnson's murder. Detective Parker asked Bogle whether he had any information about who shot his brother; Bogle responded by asking, "What did Mickey"—a friend of the Bogles who had been shot at the same time that Delroy was killed—"tell you?" Detective Parker told Bogle that Mickey said that he did not know who had shot Delroy. While Detective Parker was relating what he had learned from Mickey, Bogle interrupted him and said, "Let me tell you what happened," and proceeded to make the statement he later sought to suppress.

The district court denied Bogle's suppression motion after a two-day evidentiary hearing. The court first rejected Bogle's argument that the officers had violated his right to counsel because he had "never even made a vague reference to an attorney." The court then rejected Bogle's argument that the police had violated his right to remain silent; when Bogle said that he did not want to talk, the court found, Detective Gonzalez immediately stopped questioning him. The court held that it was not necessary for Detective Parker to read Bogle his *Miranda* rights again because Parker wanted to ask Bogle only about the murder of his brother, a crime for which Bogle was not a suspect. The court also found that Parker told Bogle that he did not want to talk about, and that he never asked Bogle any questions about, the murder of Cordell Johnson; rather, Bogle spontaneously confessed. The court concluded that Bogle had knowingly and voluntarily waived his *Miranda* rights and that he had given his confession "freely, voluntarily, and without any improper compelling influences."

At trial Bogle claimed that he had shot Johnson in self-defense, and testified as follows: On June 8 he drove a black Nissan Pathfinder to a restaurant where he picked up some food; five or ten minutes later he walked back to the restaurant in order to get some juice. Two men approached him after he left the restaurant the second time. One of the men asked him if he was Delroy's brother, and he said that he was. At this point one of the men tried to strike him with a knife. Bogle knocked the knife out of the man's hand, whereupon the man reached for his side pocket, where he had a gun. As Bogle was trying to prevent this man from drawing the gun, the other man struck him on the neck, and the blow sent both Bogle and the man with the gun to the ground. Bogle then grabbed the man's gun and stood up. He shot at one of the men, who was running away. Then he shot at the man who was on the ground. That man stood up and also began to run away. Bogle chased both men, firing more shots at them as he ran.

The Government called as a rebuttal witness Donovan Lorenzo Campbell, who testified as follows: He was at the restaurant with Johnson on June 8 when he saw Bogle and two other men pull up in a black Nissan Pathfinder. The three men came into the restaurant and, with facial expressions that were not "pleasant," walked past him and Johnson. The men got back in the truck and drove off, soon after which he and Johnson went their separate ways, Campbell by car and Johnson on foot. When Campbell returned to the area 25 to 30 minutes later he saw Johnson lying in the street with several police officers around him. Johnson did not have a gun with him when they were in the restaurant.

On cross-examination Bogle's lawyer, Richard Gilbert, asked Campbell about a four-page written statement summarizing what Campbell had told the police on the day of Johnson's murder. Campbell answered that he had signed the statement without reading it. Gilbert asked Campbell specifically about his statement to the police that he believed that Johnson had been killed by "Fiddler" and "Junior White," the people who had shot Campbell in March 1995. Campbell said that the police must have misunderstood him because he could not say that the individuals who shot him were the same ones who shot Johnson. Gilbert then asked Campbell about his statement to the police that he knew that the men who shot him in March were the same men who killed Johnson "[b]ecause they were driving the same black Nissan van." Campbell again said that the police must have misunderstood him because he had never seen that van before the day Johnson was killed. Gilbert also asked Campbell if he remembered the police asking him whether he had anything to add to his statement. Campbell responded that he did remember the question and that he had told the police that at that moment he "couldn't remember anything because [he] was so emotional." Campbell conceded that he did not tell the police that he had seen Johnson 20 minutes before he was shot or that the men who walked into the restaurant had unpleasant looks on their faces.

After Campbell was excused, the appellant moved to admit into evidence Campbell's statement to the police as a prior inconsistent

statement. The district judge sustained the Government's objection, holding that "based upon his statement that he never read it," she did not "know whether it accurately reflects his testimony."

## II. ANALYSIS

As we mentioned at the outset, Bogle challenges his convictions on two grounds. First, he claims that the district court erred in denying his motion to suppress the statement he made to Detective Parker. Second, he contends that the district court erred in denying his motion to admit Donovan Campbell's prior inconsistent statement.

### A. Motion to Suppress

The appellant argues that the district court's denial of his suppression motion was erroneous because his statement was obtained without a valid waiver of his fifth amendment *Miranda* rights and because the police did not respect his invocation of the right to counsel. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court decided that certain prophylactic warnings are necessary in order to safeguard a defendant's right against self-incrimination. The Court held that the prosecution may not use an incriminating statement that the defendant made during a custodial interrogation unless the prosecution demonstrates that (1) the defendant was informed that he had the right to remain silent, anything he said could be used against him, he had the right to have an attorney present, and if he could not afford an attorney one would be appointed for him; and (2) the defendant waived these rights. *Id.* at 479, 86 S.Ct. at 1630. If a person in custody indicates that he wants to remain silent he may not be questioned further unless he initiates communication, or (1) a significant period of time has passed after the initial questioning ceased, (2) the suspect is given a fresh set of *Miranda* warnings, and (3) the second interrogation concerns a crime that was not a subject of the first interrogation. *Michigan v. Mosley,* 423 U.S. 96, 106, 96 S.Ct. 321, 327–28, 46 L.Ed.2d 313 (1975). If the suspect invokes the right to counsel, questioning may resume when an attorney has been provided or the suspect has knowingly and voluntarily relinquished his right to counsel. *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883–84, 68 L.Ed.2d 378 (1981).

Bogle contends that the district court erroneously denied his suppression motion because Detective Gonzales did not "scrupulously honor" his invocation of the right to remain silent or obtain a waiver of his right to counsel. Although Detective Gonzales ceased questioning him immediately after Bogle indicated that he did not want to talk, it is undisputed that Detective Parker soon thereafter questioned Bogle without again reading him his *Miranda* rights or obtaining a waiver of these rights. The Government contends that Detective Parker was not required to read Bogle his *Miranda* rights anew, however, because Detective Parker did not actually "interrogate" him within the meaning of *Miranda;* the Government argues in the alternative that Bogle knowingly and voluntarily waived his *Miranda* rights.

In *Miranda* the Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. The Court expanded upon this definition in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1979), where it held that the term "interrogation" under *Miranda* refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

The appellant points out that he made his incriminating statement in response to "express questioning," and urges us to adopt a per se rule that all express questions constitute interrogation. Although we have adverted to this issue before, *see United States v. Hinckley,* 672 F.2d 115, 124 (D.C.Cir. 1982); *United States v. Foskey,* 636 F.2d 517, 522 n. 3 (D.C.Cir.1980), we have not heretofore resolved it. Several other circuits, however, have rejected the appellant's proposed

per se approach, particularly in cases involving routine booking questions, and have held that even in cases involving express questioning, there is no interrogation triggering the protections of *Miranda* unless, in the totality of the circumstances, the officer's questions were "reasonably likely to elicit an incriminating response." *See, e.g., United States v. Ventura,* 85 F.3d 708, 711 n. 4 (1st Cir.1996); *United States v. Sweeting,* 933 F.2d 962, 965 (11th Cir.1991) (routine booking questions); *United States v. Cota,* 953 F.2d 753, 758 (2d Cir.1992); *United States v. Monzon,* 869 F.2d 338, 342 (7th Cir.1989) (routine booking questions); *United States v. Taylor,* 799 F.2d 126, 128 (4th Cir.1986) (routine booking questions); *United States v. Gonzalez–Mares,* 752 F.2d 1485, 1489 (9th Cir.1985).

■ We agree with these circuits that only questions that are reasonably likely to elicit incriminating information in the specific circumstances of the case constitute interrogation within the protections of *Miranda.* As the Supreme Court explained in *Innis,* " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300, 100 S.Ct. at 1689. A question that is not likely to elicit an incriminating response is not inherently coercive and therefore should not trigger the protections of *Miranda.*

■ Because we hold that express questioning constitutes interrogation only when it is reasonably likely to elicit an incriminating response, we must consider whether Detective Parker's questioning about the murder of the appellant's brother runs afoul of that standard. This is an objective inquiry; the subjective intent of the officer is relevant but not dispositive. *See Innis,* 446 U.S. at 301 n. 7, 100 S.Ct. at 1690 n. 7. Applying this standard, we conclude that Detective Parker's discussion with Bogle did not constitute interrogation. There is no evidence in the record indicating that when Parker and Bogle met, the detective (or any other police officer) had reason to believe that there was any connection between the murders of Bogle's brother and of Cordell Johnson. Furthermore, Detective Parker was careful to inform Bogle that he was not there to ask about the murder of Cordell Johnson and that he wanted to talk only about the murder of Bogle's brother.

Because we conclude that Bogle was not subject to interrogation when he made the incriminating statements he seeks to suppress, we need not consider whether the police failed to obtain a knowing and intelligent waiver of his right to remain silent or of his right to counsel.

**B. Prior Inconsistent Statement**

■ Bogle also argues that under Federal Rule of Evidence 613(b) and *Gordon v. United States,* 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), the district court was required to admit extrinsic evidence of the prior inconsistent statement of the Government's rebuttal witness Donovan Campbell. Bogle claims that the district court's failure to do so was prejudicial for two reasons: in the prior statement, unlike his trial testimony, Campbell identified other men as Johnson's murderers; and there were things Campbell mentioned at trial that he did not tell the police—particularly that the men who came into the restaurant, including Bogle, had unpleasant looks on their faces. The Government responds that the district court did not err in rejecting Bogle's proffer because the statement contained hearsay and because the defense never established either that Campbell actually made the statement the police recorded or that the statement was inconsistent with Campbell's trial testimony.

We need not decide whether the district court erred in excluding Campbell's prior statement because its exclusion was clearly harmless. Bogle was able to point out during cross-examination, without presenting the statement to the jury, that Campbell did not tell the police about the encounter in the restaurant, and Campbell conceded that the statement differed significantly from the testimony he gave in court. In addition, Campbell's statement to the police that Fiddler and Junior White—as opposed to the appellant—killed Cordell Johnson, was of little importance if any because Bogle admitted at trial that he was the one who killed Johnson. The only potential relevance of this statement is in its bearing upon Campbell's credi-

bility; without seeing the actual statement the jury was aware, however, that Campbell had given the police a signed statement that Fiddler and Junior White shot Johnson, and that he had tried to repudiate it at trial. Accordingly, we conclude that Bogle was in no way prejudiced by the court's refusal to admit the written statement into evidence.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is in all respects

*Affirmed.*