IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,899

STATE OF KANSAS,
*Appellee*,

v.

MACIO DOMINGO PALACIO JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

Once the right to have counsel present during interrogation has been invoked, the courts impose a relatively rigid requirement that interrogation must cease. The interrogation can continue only after a lawyer has been made available or the suspect reinitiates the interrogation.

2.

An officer's explicit questioning is not per se interrogation. Rather, it is subject to the same test as an officer's other conduct. An officer's words or actions, including explicit questioning, is interrogation only if the officer should have known that the questioning was reasonably likely to elicit an incriminating response from the suspect.

3.

If officers stop interrogating a suspect upon the suspect's invocation of the right to counsel, the suspect may waive the previously invoked right. To do so, the suspect must provide statements that evince a willingness and a desire for a generalized discussion about the investigation and are not merely a necessary inquiry arising out of the incidents of the custodial relationship.

1

4.

Based on the Fifth Amendment right against self-incrimination and the Fourteenth Amendment Due Process Clause, a coerced confession is inadmissible.

5.

Although rare, a confession can be coerced even if officers complied with *Miranda* and the accused unambiguously waived the right to counsel. The primary consideration when examining whether a confession was coerced is voluntariness.

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed June 7, 2019. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, argued the cause and was on the brief for appellant.

*Ellen Hurst Mitchell*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  A jury convicted Macio Palacio Jr. of first-degree murder under theories of premeditation and felony murder, attempted first-degree murder, criminal discharge of a firearm at an occupied vehicle, and conspiracy to commit aggravated battery. We affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

On May 5, 2015, Stephen Gentry had an altercation with his girlfriend, Kaylee Ovalle. The next day, Ovalle went to collect her personal items from their shared

apartment. She brought three people with her—her mother, Amber Ovalle (Amber); Amber's boyfriend, Chad Bennett; and Bennett's friend, Anthony Darby. They all drove together in Ovalle's grandfather's green pickup truck. When they arrived at the apartment complex, they encountered Gentry and another man in the parking lot. Bennett asked Gentry to give him the keys to the apartment. This led to an argument, and Darby punched Gentry in the face, breaking his glasses. After this incident, Ovalle, Amber, Bennett, and Darby left.

Earlier in the day on May 6, 2015, Daniel Sims and Gentry were in Sims' apartment, which was located across the hall from Gentry's and Ovalle's apartment. Sims testified that on that day, he met Palacio when Palacio came to Sims' apartment with his girlfriend and Andrew Woodring. Palacio had a handgun with him and stayed at the apartment for about 30 minutes before leaving with his girlfriend and Woodring. After the three left, Sims and Gentry went to a convenience store across the street. When they returned, they encountered Bennett and Darby in the same parking lot where the earlier argument had occurred.

A short time after this encounter, Sims went to Jerome Forbes' apartment, which was also located in the same apartment complex. Gentry and Forbes were both there. Gentry was very angry and wanted revenge. He wanted to fight Bennett and Darby. Gentry began calling people to try to find a gun. Palacio and Woodring arrived at Forbes' apartment, and Gentry asked Palacio, "Did you bring that?" Palacio responded, "I got that."

Woodring, Forbes, Sims, Gentry, and Palacio drove in Woodring's Honda Civic to where Bennett lived and parked a block away. When they noticed that no one was home, they returned to the car. Before they left, headlights appeared in the street. Gentry wanted to wait to see "if it was them." A truck appeared and slowed down as it passed them.

3

Gentry told Palacio to shoot. Palacio fired five shots towards the truck. Sims and Forbes ran away. Neighbors in the area testified to hearing gunshots around 9:30 p.m. on May 6, 2015, and then seeing a Honda Civic erratically speed away. One of the neighbors recorded the car's license plate. The police traced this car to Woodring.

One of the shots hit Allie Saum, who had been sitting in the passenger seat of the truck. Vince Johnson, Saum's boyfriend, had been driving the truck. Neither of them knew Palacio or any of the codefendants. Saum died early the next morning.

When police responded to the scene, they found five spent shell casings in the street and a projectile in the dash of Johnson's truck. Investigators eventually learned that Palacio might have been connected to Saum's death. Officers went to Palacio's house early in the morning on May 7, 2015 and took Palacio into custody. After they cleared the house, the officers allowed Palacio's girlfriend, Azucena Garcia, to go back into the house to get some belongings for her children. During one of her trips inside to collect belongings, Garcia attempted to conceal a Glock model 30, .45 caliber handgun. When officers discovered the gun, they also took Garcia into custody. A forensic scientist later testified that the casings in the street and the projectile in Johnson's dash were fired from this gun.

Sergeant James Feldman and Lieutenant William Cox interviewed Palacio in connection with Saum's murder on May 7, 2015. The officers *Mirandized* Palacio before asking him any questions, and Palacio agreed to speak to them without an attorney present. Palacio told the officers that on the day in question, Woodring had asked him if he wanted to go with him to find Gentry—who had been jumped—but that he declined. Sergeant Feldman then told Palacio that he knew Palacio was at the shooting and that his gun was used. Lieutenant Cox told Palacio "I think about some poor girl's parents." At

that point, Palacio stated "[h]onestly, I just want to talk to my attorney." The following interaction then took place:

> "[Sergeant Feldman:]  That's fine. You are being charged with felony murder and shooting into an occupied vehicle. Your girlfriend is being charged with felony obstruction and child endangerment.
>
> "[Lieutenant Cox:]  Do you have any felony convictions?
>
> "[Palacio:]  Um, I have pending charges right now.
>
> "[Sergeant Feldman:]  Drug convictions?
>
> "[Palacio:]  Yes, sir.
>
> "[Sergeant Feldman:]  Okay. So that's what's happening.
>
> "[Lieutenant Cox:]  Well, we'll have you have a seat out here and get the paperwork together and get you next door.
>
> "[Palacio:]  I'd like to say something else.
>
> "[Sergeant Feldman:]  What's that?
>
> "[Palacio:]  Um, you want to take a seat.
>
> "[Sergeant Feldman:]  Do you want to continue talking?
>
> "[Palacio:]  Yea.
>
> "[Sergeant Feldman:]  Without an attorney present?
>
> "[Palacio:]  Yea, I'll do that.
>
> "[Sergeant Feldman:]  Okay.
>
> "[Palacio:]  Um, honestly, I was there.
>
> "[Sergeant Feldman:]  Mm-hmm.
>
> "[Palacio:]  I was there.
>
> "[Sergeant Feldman:]  Why don't you walk us through what happened then."

Palacio then told officers he had gone with Woodring to meet with Gentry and then gone to the area where Ovalle lived. When they realized Ovalle was not there, the others said they should leave, but then a truck passed by and everybody started "freaking out." Eventually, Palacio admitted that he fired the gun towards the truck after Gentry told him to shoot.

5

The State charged Palacio with first-degree murder under theories of premeditation and felony murder for the killing of Saum, attempted first-degree murder for the attempted killing of Johnson, criminal discharge of a firearm into an occupied vehicle, and conspiracy to commit aggravated battery.

On October 7, 2015, Gentry filed a motion to change venue, arguing that significant pretrial publicity made it impossible for him to receive an impartial jury in Saline County. Gentry submitted numerous media articles covering the Saum murder with this motion. After an evidentiary hearing, the district court denied the motion.

On February 22, 2016, Palacio filed a motion to suppress his confession. The district court judge suppressed the statements Palacio made in-between the time he asked for a lawyer and the time he told the officers he wanted to say something else. The judge declined to suppress any of his other statements.

The case proceeded to trial, and the jury found Palacio guilty of first-degree murder under theories of premeditation and felony murder, attempt to commit first-degree murder, criminal discharge of a firearm, and conspiracy to commit aggravated battery.

The district court judge sentenced Palacio to life imprisonment without the possibility of parole for 50 years for the first-degree murder conviction, 234 months' imprisonment for the attempted first-degree murder conviction, 59 months' imprisonment for the criminal discharge of a firearm conviction, and 6 months' imprisonment for the conspiracy to commit aggravated battery conviction. The judge ordered the three shortest sentences to run concurrent to the life sentence.

6

Palacio appealed to this court.

ANALYSIS

*Motion to Change Venue*

In the district court, Palacio argued that he was entitled to a change of venue under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10 of the Kansas Bill of Rights because the pretrial publicity was so great he could not receive a fair and impartial trial in Saline County. Palacio also appeared to assert that he was entitled to a change of venue under K.S.A. 22-2616. The district court judge disagreed and denied Palacio's motion. Palacio appealed that decision. At oral argument, he stated that he only challenges the district court's conclusion with regard to his statutory right to a change in venue.

We review the trial court's decision on a motion to change venue pursuant to K.S.A. 22-2616(1) for an abuse of discretion. An abuse of discretion occurs "when the trial court makes an error of law; bases its decision on facts not supported by the evidence; or makes an arbitrary, fanciful, or unreasonable decision." *State v. Longoria*, 301 Kan. 489, 509, 343 P.3d 1128 (2015).

K.S.A. 22-2616(1) directs a trial court to grant a defendant's motion to change venue if it "is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county." In determining whether these circumstances exist, the trial court considers the following nine factors:

> "'(1) the particular degree to which the publicity circulated throughout the community;
> (2) the degree to which the publicity or that of a like nature circulated to other areas to

7

which venue could be changed; (3) the length of time which elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the ease encountered in the selection of the jury; (5) the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; (6) the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the venire is drawn.'" *Longoria*, 301 Kan. at 510 (quoting *State v. Carr*, 300 Kan. 1, Syl. ¶ 10, 331 P.3d 544 [2014], *rev'd and remanded on other grounds*, 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 [2016]).

The district court judge considered the nine-factor statutory test and made findings on each. She found that factors one and eight weighed "slightly in favor of a change in venue," and that factors two, three, seven, and nine did not weigh in favor of a change in venue. She also found that factors four, five, and six were inapplicable. Based on this she concluded that Palacio had not shown there was prejudice in the community significant enough to warrant a change in venue.

Palacio argues that the district court judge abused her discretion when it held that the eighth factor—the severity of the crime—weighed slightly in favor of a change of venue because no reasonable person would agree. He asserts that it weighed "overwhelmingly in favor of prejudice." Palacio has not persuaded us.

This court found that this factor weighed in favor of a change of venue in *Carr*, where the defendants were charged with multiple counts of capital murder and rape, among other severe crimes, and in *Longoria*, where the defendant was charged with capital murder. 300 Kan. at 81; 301 Kan. at 510.

Palacio was charged with first-degree murder, attempted first-degree murder, criminal discharge of a firearm at an occupied vehicle, and conspiracy to commit

aggravated battery. Because one of these crimes was a homicide, it was reasonable to conclude that this factor favored a change of venue. But, because all of the crimes are lesser crimes than those in *Carr* and *Longoria*, it was also reasonable to find that they only slightly weighed in favor of a change of venue. The district court judge did not abuse her discretion when it came to this conclusion. Consequently, Palacio's challenge to the court's denial of his motion to change venue fails.

*Motion to Suppress Confession*

Palacio argues that the district court violated his Fifth Amendment rights under the United States Constitution when it denied his motion to suppress his confession. He primarily argues that officers violated his rights because they continued interrogating him after he asked for a lawyer. In the alternative, he argues that his confession was involuntary because the police used coercive tactics.

We use a bifurcated standard of review when considering a district court's decision on a motion to suppress evidence. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). First, we review the district court's factual findings to determine whether they are supported by substantial competent evidence. In reviewing the factual findings, we do not reweigh the evidence or assess the credibility of witnesses. Second, we review the ultimate legal conclusion de novo. *Patterson*, 304 Kan. at 274.

*Palacio's request to speak to an attorney*

"The Fifth Amendment to the United States Constitution guarantees . . . the right to have a lawyer present during custodial interrogation and the right to remain silent." *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966]). Certain "procedural safeguards

are necessary to protect" these rights. *Rhode Island v. Innis*, 446 U.S. 291, 297, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). "More specifically, . . . 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *Innis*, 446 U.S. at 297 (quoting *Miranda*, 384 U.S. at 444). These safeguards are now known as the *Miranda* warnings—statements from law enforcement officials informing defendants of their rights. *Innis*, 446 U.S. at 297. Once these warnings have been given, "'the subsequent procedure is clear. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.'" *Innis*, 446 U.S. at 297 (quoting *Miranda*, 384 U.S. at 473-74); see also *State v. Salary*, 301 Kan. 586, 604, 343 P.3d 1165 (2015) (If "the accused has unambiguously invoked the right to counsel, questioning must cease immediately and may be resumed only after a lawyer has been made available or the accused reinitiates the conversation with the interrogator.").

Here, the district court judge made the following factual findings:

"[A]fter defendant asked to speak to an attorney, Sergeant Feldman proceeded to advise the defendant of the offenses he and his girlfriend were being charged with. The officers then asked the defendant if he had any felony convictions or drug charges. After the defendant answered these questions, the officers stood up to leave and stated they would get the paperwork prepared. The defendant then stated he wanted to speak further to the officers and asked them to sit down. After Sergeant Feldman inquired as to whether the defendant wished to speak to them without an attorney, the interrogation continued.

"The officers testified that defendant was asked whether he had any felony convictions or drug offenses, to determine whether he could be charged with being a felon in possession of a firearm."

Palacio does not challenge these findings. He challenges the district court's legal conclusions based on these findings. Those were as follows:

> "The Court concludes that the responses the defendant gave to the officers as to whether he had any felony convictions or drug charges should be suppressed, as the questions were asked after the defendant invoked his right to counsel. The Court finds all other statements made by the defendant before he invoked his right to counsel and after he asked to continue to speak to them without an attorney were the product of his free and voluntary will and were made without any threats, coercion, or deceptive practices on the part of the officers. And so the parties will need to make the appropriate redactions."

Palacio asserts that the statements the officers made and the questions they asked him immediately after he invoked his right to counsel were interrogative and, consequently, a violation of his constitutional rights. Based on this conclusion, he argues that everything he said to the officers after he invoked his right to counsel should have been suppressed.

The State agrees that Palacio unambiguously invoked his right to counsel and that, as a result, all interrogation should have stopped until Palacio was provided a lawyer or he reinitiated the interrogation. But the State maintains that the questions the officers posed immediately after he asked for a lawyer were routine questions that did not amount to interrogation and were therefore permissible under the Fifth Amendment. They argue that Palacio then reinitiated the interrogation and thus any answers he provided to the line of questions that followed were admissible.

The question we face is whether the officers' statements and the questions they asked of Palacio immediately after he invoked his right to counsel were interrogation. If they were, then the officers stepped over the constitutional line, because "[o]nce the right to have counsel present during interrogation has been invoked, the courts impose a

11

relatively rigid requirement that interrogation must cease." *State v. Cosby*, 285 Kan. 230, 242, 169 P.3d 1128 (2007). The interrogation can continue only after a lawyer has been made available or the suspect reinitiates the interrogation. *Cosby*, 285 Kan. at 242. Although Palacio asked the officers to sit down and told them he wanted to talk without a lawyer present after he listened to those statements and answered the questions, his comments would not qualify as reinitiation if they occurred after interrogation. "A valid waiver of a previously asserted right cannot be established by showing only that the suspect responded to further police-initiated custodial interrogation, even if the suspect has been advised of his rights." *Cosby*, 285 Kan. at 242 (citing *Edwards v. Arizona*, 451 U.S. 477, 482, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 [1981]).

The United States Supreme Court has described interrogation as "express questioning," or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301.

Although *Innis* seems to hold that "explicit questioning" always constitutes interrogation, most courts have interpreted it differently. In *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981), the Ninth Circuit said that the Court's opinion in *Innis*

> "appears to assume that direct questioning of a suspect in custody always constitutes interrogation. Other courts have so held. [Citations omitted.] However, we believe the reasoning supporting the Court's decision, indeed the very purpose behind *Miranda* itself, compels the conclusion that not every question posed in a custodial setting is equivalent to 'interrogation.' . . . Many sorts of questions do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent." *Booth*, 669 F.2d at 1237.

12

The court held that explicit questioning is only interrogation if it is "'reasonably likely to elicit an incriminating response from the suspect.'" *Booth*, 669 F.2d at 1237 (quoting *Innis*, 446 U.S. at 301); see also *United States v. Bogle*, 114 F.3d 1271, 1275 (D.C. Cir.), *cert. denied* 522 U.S. 938 (1997) (express questioning is not always interrogation because "[a] question that is not likely to elicit an incriminating response is not inherently coercive and therefore should not trigger the protections of *Miranda*"). While other courts have interpreted *Innis* more literally, see *United States v. Montgomery*, 714 F.2d 201, 202 (1st Cir. 1983) (express questioning is always interrogation), the Ninth Circuit's interpretation is certainly the more common reading of *Innis*. Skelton & Connell, *The Routine Booking Question Exception to* Miranda, 34 U. Balt. L. Rev. 55, 69-70 (2004) (collecting cases and explaining that at the time, only the First Circuit followed a rule that express questioning was always interrogation).

This understanding comports with a plurality decision of the United States Supreme Court. In *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990), it held that "[r]outine booking questions" are exempt from *Miranda*'s coverage. These include "questions to secure the 'biographical data necessary to complete booking or pretrial services,'" like questions regarding "name, address, height, weight, eye color, date of birth, and current age." *Muniz*, 496 U.S. at 601.

This court has never directly addressed whether explicit questioning is always interrogation. But our cases have indicated that it is not. In *State v. Hebert*, 277 Kan. 61, 70, 82 P.3d 470 (2004), officers asked a suspect in custody whether he wanted to share his side of the story. This court considered the question to constitute interrogation not because it was a question, but because the officers should have known the defendant would respond in an incriminating manner. 277 Kan. at 70; see also *State v. Ninci*, 262 Kan. 21, 36, 936 P.2d 1364 (1997) (questions were interrogation because the officers should have known they were likely to elicit an incriminating response). And in *State v.*

*Garcia*, 233 Kan. 589, 664 P.2d 1343 (1983), we confirmed that routine booking questions are not interrogation because they are not likely to elicit an incriminating response. Finally we have also explained that a request that subjects identify themselves is not interrogation. *State v. Taylor*, 231 Kan. 171, 174, 642 P.2d 989 (1982).

Today we confirm that express questioning is not per se interrogation. Rather, it is subject to the same test as an officer's other conduct. An officer's words or actions, including explicit questioning, is interrogation only if the officer should have known that the questioning was "reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301.

We now consider whether any of the things the officers said to Palacio after he invoked his right to counsel were interrogation. Whether words or actions are likely to elicit an incriminating response "focuses primarily upon the perceptions of the suspect, rather than on the intent of the police." *Innis*, 446 U.S. at 301. Courts should review what officers "should have known." *Innis*, 446 U.S. at 302.

In *Herbert,* this court concluded that an officer's question was interrogative when he asked whether the defendant would like to share his side of the story. 277 Kan. at 70. And in *Ninci*, the defendant was subject to interrogation when an officer asked him if he recognized a photograph of a primary suspect and why his car was in front of the victim's house during the same week as the murder.

In contrast, in *Garcia*, 233 Kan. at 607, this court found that questions on a personal history sheet were not interrogative. The questions asked for the defendant's "name, address, physical description, description of his car, names and addresses of relatives, prior arrests, and his parole officer." 233 Kan. at 602. In a similar vein, some courts have held that declarative statements about what charges would be pursued against

14

the subject or the evidence against them were not interrogation. *United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992); *Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir. 1989). In *State v. Thurber*, 308 Kan. 140, 152, 420 P.3d 389 (2018), there was no concern that discussion between the defendant and an officer who held the defendant in custody amounted to interrogation because it was "small talk unrelated to the investigation."

The comments and questions here were similar to the questions in *Garcia* and the discussions in *Thurber*. They were either declarative statements meant to inform Palacio of the reasons he and his girlfriend were in custody, or they were questions that did not otherwise concern Palacio's involvement in or knowledge of the crimes the officers were investigating. The officers were not offering any information for Palacio to consider or pressuring him to change his mind. Consequently, the comments and questions were not interrogation and they did not violate Palacio's Fifth Amendment rights.

Because the officers did not continue to interrogate Palacio after he invoked his right to counsel, Palacio was free to waive his previously invoked right. An accused may do so with statements that "evince 'a willingness and a desire for a generalized discussion about the investigation'" and are "'not merely [] a necessary inquiry arising out of the incidents of the custodial relationship.'" *Walker*, 276 Kan. at 947 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46, 103 S. Ct. 2830, 77 L. Ed. 2d 405 [1983]).

Palacio provided these statements here. The district court judge found that, after Palacio told the officers about his other convictions, "the officers stood up to leave and stated they would get the paperwork prepared." After they stood, Palacio "then stated he wanted to speak further to the officers and asked them to sit down. After Sergeant Feldman inquired as to whether the defendant wished to speak to them without an attorney, the interrogation continued."

Based on these findings, we conclude that Palacio knowingly and intelligently waived his previously invoked right. His statements "showed a desire . . . to re-engage in dialogue with law enforcement about the investigation." *Thurber*, 308 Kan. at 156. As a result, the interrogation that followed was proper under the Fifth Amendment.

*Voluntariness of Palacio's confession*

In the district court, Palacio advanced an alternative argument—that, even if he waived his right to counsel, his eventual confession was involuntary because the police used coercive tactics.

Based on the Fifth Amendment right against self-incrimination and the Fourteenth Amendment Due Process Clause, a coerced confession is inadmissible. *Dickerson v. United States*, 530 U.S. 428, 433-34, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). Although "rare," a confession can be coerced even if officers complied with *Miranda* and the accused unambiguously waived the right to counsel. *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

The primary consideration when considering whether a confession was coerced is "voluntariness." *State v. Swindler*, 296 Kan. 670, 678, 294 P.3d 308 (2013). It is the State's burden to show "that a defendant's statements were voluntarily made." *Swindler*, 296 Kan. at 679. To decide whether a confession was involuntary, the court looks to the totality of the circumstances after considering a list of six nonexclusive factors:

> "'(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. [Citations

16

omitted.]'" *State v. Swindler*, 296 Kan. 670, 678, 294 P.3d 308 (2013) (quoting *State v. Gilliland*, 294 Kan. 519, 528-29, 276 P.3d 165 [2012]).

In this case, the district court judge considered each of these factors before concluding that Palacio made his confession voluntarily. Palacio challenges the judge's decision with regard to the fifth factor only—the fairness of the officers in conducting the interrogation. The judge made the following findings and conclusions with regard to that factor:

"The Court finds based upon the recorded interrogation that the officers spoke to the defendant in a polite and conversational tone. The defendant did not at any time—or, excuse me. The officers did not at any time threaten, coerce, or engage in deceptive practices during the interview. No promises or threats were made. The Court finds that the defendant was treated fairly by the officers during the interrogation."

Palacio disagrees with the court's conclusion that the officers did not threaten or coerce him. He asserts it was coercive to tell Palacio what he was being charged with and to tell him to think of Saum's parents, and that the officers meant to threaten him when they told him about his girlfriend's charges and asked about his felony convictions. We disagree.

In *State v. Swanigan*, 279 Kan. 18, 39, 106 P.3d 39 (2005), this court held that the officers' repeated lie that a robbery suspect's fingerprints had been found on a window suggested a coerced confession. The officers also threatened to convey the suspect's lack of cooperation and charge him with additional crimes. Because the officers also took advantage of the suspect's low intellect and susceptibility to being overcome by anxiety, the totality of the circumstances showed that the resulting confession was involuntary. 279 Kan. at 39. In *State v. Stone*, 291 Kan. 13, 32, 237 P.3d 1229 (2010), this court again

17

found that officers' tactics suggested coercion when they made untrue statements indicating the suspect's semen had been found on the pajamas of the victim.

Sergeant Feldman testified that he told Palacio what he would be charged with so Palacio would know the charges. Sergeant Feldman indicated that Palacio's girlfriend had also been arrested, so he told Palacio what she would be charged with so he was also aware of her charges. Lieutenant Cox testified that he asked Palacio if he had any other felony convictions because he was trying to determine if Palacio would also be charged as a felon in possession of a firearm. Sergeant Feldman testified that he then asked Palacio if he had drug charges because "someone addicted to drugs cannot also possess a firearm."

From this testimony, it appears that the officers did not tell any untruths, unlike the officers in *Swanigan* and *Stone*. Their statements could be perceived as threats—subtle hints that Palacio and his girlfriend are already in trouble and should talk to the officers. But the officers never explicitly threatened Palacio or promised to help him if he talked. This court made the same observation in *State v. Sharp*, 289 Kan. 72, 90, 210 P.3d 590 (2009), when considering whether officers had coerced a suspect's statements. Although it acknowledged that promises can be implicit, the officer's testimony indicated that he never intended to make an implicit promise. 289 Kan. at 90. Likewise, here, the officers both testified that they asked Palacio these questions because they wanted to know what other charges they could file against him—not as a threat, but as a matter of fact.

Palacio also argues that Lieutenant Cox's statement to Palacio that "I think about some poor girl's parents," was coercive. Lieutenant Cox said this immediately before Palacio asked for an attorney. But "[p]olice appeals to the defendant's sympathies, such as by the now-famous 'Christian burial speech' ploy, 'do not automatically render a confession involuntary.'" LaFave, 2 Criminal Procedure § 6.2(c) (4th ed. 2019) (quoting

18

*Stawicki v. Israel*, 778 F.2d 380, 383 [7th Cir. 1985]). Rather, "[t]heir use must instead be considered in conjunction with the rest of the circumstances." *Stawicki*, 778 F.2d at 383. Because Palacio does not suggest that any of the other factors suggested coercion, this single statement fails to render his confession involuntary—even if it was coercive.

Consequently, the district court judge did not err when she found that the officers did not threaten, coerce, or engage in deceptive practices, concluded that Palacio's confession was voluntary, and denied his motion to suppress.

We affirm the convictions.

JOHNSON, J., concurs in the result.